RECEIVED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUN 20 2025

KEVIN P. WEIMER, Clerk
By WILLIE J MITCHELL SR / Deputy Clerk

UNITED STATE DISTRICTS COURT THE NOTHERN DISTRSICT OF GEORGIA ATLANTA DIVISION

WILLIE J MITCHELL SR /    _ (Pro-Se)

Plaintiff's ,

-Vs-

THE STATE of GEORGIA

JUDGE CRAIG SCHWALL

FULTON COUNTY DISTRICT ATTORNEY

PAUL HOWARD ASSISTANT DISTRICT

ATTORNEY LINDA DUNCOSKI

ROSWELL GEORGIA POLICE DEPARTMENT

LT. JASON WESCOTT SANDY SPRINGS

GEORGIA POLICE DEPARTMENT

Defendants ,

CIVIL ACTION CASE NO:

**1 : 25 -CV- 3 4 7 1**

## CIVIL COMPLAINT FOR VIOLATING OATH OF OFFICE

Now come the plaintiff Willie J Mitchell do here by file my Civil Complaint against the above named Defendants for conspiracy to Obstruction of Justice 18 U.S.C. [ 241. Felonious misconduct , Violation of Oath of offices Federal Code ,U.S. Code 18 U.S.C. Fraudulent Conviction 18 U.S.C. [ 100 The Defendants also Denied the Plaintiff due processes (6th AMENDMENT with a speedy trail with an imparcial Jury and 13 AMENDMENT the right to be duly prosecuted and forced into SLAVERY by denying me a right to a Trail. FALSE IMPRISONMENT [ 11,404 and the case against me for a misdemeanor DUI WAS NOT BRUGHT TO TRAIL UNTILL 4 YEARS AFTER LT.JASON WESCOTT FALSELY IMPRISONED AND ARRESTED ME. Georgia Code } 17-3-1(d) Statute of. Limitation for

### FACT

1.Judge CRAIG SCHWALL told me The Plaintiff, Willie J Mitchell that I did not deserve a trail (Total and Compleat Brian Nichols Retaliatory BIAS VERDICT) because the assistant Fulton County District Attorney, LINDA DUNKOSKI, charged me in front of the judge with making a terroristic threat which was a lie, I never made a threat toward anyone but the threat she said I made was that I was going to go Brian Nichols she knew it was a lie when she said it because I was not arrested for that LIE I was arrested because Lieutenant Jason Westcott found out that I was hospitalized after I was kidnapped and tortured by the Roswell Police Department and a victim of sexual battery by ROSWELL POLICE officers both white, male James Spivey and female, officer Erin Johnson they assaulted me, followed me home to me

and my son ( Willie Joe Mitchell/Carlisle ) apartment were my 911 emergency phone call to go via ambulance to North Fulton Regional Hospital. After Hearing The knock at the front door officers SPIVEY and Johnson broke the door off the casing and knocked my naked BLACK ASS onto the floor. They picked me up, and ordered me to put my hands up against the wall and while naked with SPIVEY service weapon against the back of my head SPIVEY cock the hammer back while officer Johnson squatted down between my naked BLACK MAN hood and the wall and performed Oral Sex on me and Spivey Sodomized me. The Sandy Spring Police said that I said Jason Wescott needed to die and I have the paperwork to prove it. This is not frivolous complaint and the statue of limitation does not expire until and while the criminal acts by the State of Georgia are no longer having an imparical impact on my physical, mental and financial well-being and welfare. (Exhibit A) Also this complaint is that a new discovery of new evidence(The United States Federal Court is here by demanded to Oder the City of Roswell Georgia Police Department to Honor the open r record request made by the Plaintiff over 30 times case number  1:09-CV-02209-CPT and 1:09-023179) the felony they are committing is affecting my company and my professional brand I'm a commercial license driver who lost his ability to work it cost me financially and physical damages that existed until I was well enough and had new evidence to prove that this is an ongoing criminal act by the state of Georgia. So stop calling my complaints frivolous this is a racist hate crime by racist white sick Georgia judges lawyers and police. I demand that This Court order the city of Roswell Georgia Police Department To release all dash cam video,  Vest cam video and videos of me being brought into the city of Roswell Georgia Police jail butt Black ass naked by white police woman Erin Johnson also all booking of intake, also all paper works from both hospitalization from the abuse while in custody .  case number 1:09-CV-02209-CPA & 1:09-023179 SHE SUCKED MY PENIS AND TOOK ME OUT SIDE NAKED. THET REFUSED MY OPEN RECORD REQUEST 67 TIMES SO YOU BETTER DO IT. I filed a civil complaint against the city of Roswell Georgia Police Department but your court said it was also felonious because th7e video shows a naked Black ass man being escorted by the white policewoman that preformed oral sex on me.

2. My sister Robyn Charlene Mitchell was the former sister Federal prosecutor for the justice department in the same Federal Building  where  I'm filing my complaints my sister was present when the judge violations His Oath of Office by denying me a trial she advised me that his impartiality was in question and that he must recuse himself. Because my son saw Officer Johnson perform fellatio on me then Spivey told me that this was a gift from Westcott and he Proceeded to Sodomize my rectum And because of the pain I screamed  and my son Shocked Both offices Because they didn't know he was there And he told them to stop hurting his father Spivey pointed that cock pistol At my son and told him to shut thef****** and sit down I Begged him to  do what the cop said and then The penis sucker was taking me outside naked and I begged her not to. My son gave Spivey  a pair of blue shorts for them to cover my naked Black Ass Up Officer Johnson  said I'm not putting them on him, I'm taking him outside naked so I can charge him with indecent exposure this was a Violation of their OATH of Office also a violation of the plaintiffs Human Rights, Civil rights And a violation of equal protection under the law GA Code 23 LC 48 0717 H. B.496-1. Judge these Felonious Criminal Misconduct acts  have left no doubt that the Civil Complaint/ for Settlement is A lot Of things Most of them are  Evil, Disgusting, Sickening and Unimaginable But one thing my complaint isn't and that's FFRIVOLOUS!

3. The judge was also going to here at the same time the car accident (September 15ʰ 2006) were a drunk WHITE MAN RAN A RED LIGHT  while I was making a legal left turn my son was sitting in the passenger seat and my sister's daughter was in the back set ( I had picked our Babies up from our Private

schools, thank God for Roswell Police Officer GARCIA who got inside the car with us held my sister's daughter by her little baby girl hand, and had my son South Flighted to Scottish Right Children's Hospital when he realized my baby(Willie Joe Mitchell Jr) wasn't dead and he started moaning he also stated that while I (Willie J Mitchell SR) was unconscious Roswell GEORGIA POLICE OFFICER GARCIA heard the Plaintiff Willie J MITCHELL SR clearly say THAT THE WHITE VAN RAN THE RED LIGHT . While I was in the hospital being treated for traumatic Brain injury and in a coma I felt someone hit my head twice I opened my eyes and I was struck again with the fist in my head by LIEUTENANT JASON WWESTCOTT The City of ROSWELL GEORGIA POLICE DEPARTMENT who told me if I did not put my Signature on a Document that I couldn't see clearly and couldn't READ he was going to take me to jail for driving under the influence I told him I can't read that I can hardly see it. I said if it'll stop you from trying to kill me show me where to Sign. The white nurse stood there listening to what I was saying and watching this idiot, this Mad Dog beat me in my head The Plaintiff, Willie J Mitchell Sr all this INHUMANITY while I'm being treated for traumatic brain injury it wasn't until I looked under the sheet and saw I had a Catheter Bag Full of blood and the internal organ fluid leakage and I asked the nurse where my children were and to get my clothes so I can go find them she came back and told me that the doctor told her to alert him as soon as I regain Consciousness so he could complete his EVALUATION and that I was to stay overnight for OBSERVATION, I said you should have told me that before you let that KKK WHITE SUPREMACIST try to kill me, so I told her to get the syringe so I could pull the air out of the Catheter and get my clothes because I got to find the children because they didn't know where they were and I didn't think my son was still alive because that DRUNKEN WHITE MAN and HIS TWO DRUNK FRIENDS/COWORKERS RAN A REDLIGHT!

4. The car accident happened in September the 15th 2006 here we are 4 years later the statue of limitation on a car wreck is 2 years for civil case Westcott tried to frame me for that accident and he also committed perjury in 2009 when he took the witness stand and lied while under oath that he never had any contact with me until the car accident in September of 2006 but he was testified to when he met me on August 27th 2006 at Grady Hospital after the police decided not to take me around the corner after they separated my shoulder to North Fulton regional hospital I accused Jason Westcott of telling them to do that so I would be silenced and not report that they separated my shoulder on video while I was in the back of the car the judge in that case had the video and both attorneys for the state the solicitor and the court appointed attorney both watch that dash cam video and both of them ask the police to lie to the jewelry by saying they didn't know where it was before headline since her ugly racist right behind on that bench looking at me with that dash cam video in her laptop she's an evil s*** black girl playing mad female dog just like judge Criswell is a Mad Dog and he broke the law he doesn't have the right to deny anyone a trial and neither do you my case is not frivolous all you got to do is ask judge Craig swap why did you tell him he didn't deserve a trial why did you lock him up after you ask you to accuse yourself and try to kill him because you knew all you had to do is keep his medication for his Gout from him, it's in the records it's in the court records and I have them and I want the Jury to see it when I present my case for me and my son being raped, Molested, Kidnapping torture and Retarded by the state of Georgia and it's officer that enforce the law.

5. . Next thing that happened is I asked the judge to recuse himself because like my attorney / sister said he doesn't have the right to deny a person a CRIMINAL trial that's why this complaint is not frivolous because you don't have the right to deny a person a criminal trial and you shouldn't have the right to keep this Dismissing These cases as FRIVOLOUS because you want to keep your Confederates judges

and lawyers from taking accountability for the criminal FELONIOUS EVIL MISCONDUCT that they have displayed and for 17 years I've had to suffer getting BUTT f*** bye these four JUDGES, SOLICITORS, DISTRICT ATTORNEY'S AND ASSISTANT DISTRICT ATTORNEY because I am being Restrained by someone who's biography claims that they became a sworn Enforcer of the LAW because JUSTICE TUGGED AT HIS HART. all I'm asking you to do is let me have my day in court, I will proved that everything that happened to me was fraudulent evil and was as racist as when AMERICAN SLAVE OWNERS Were Raping, Enslaving and brutalizing not just the SLAVES that got over here on the BOAT but the CHILDREN THEY HAD WITH THE AFRICAN GIRLS AND OLDER FEMALES THAT THEY RAPED. They Raped those children too and Sold and Enslaved Their WHITE AMERICAN CHILDERN. Now that's what Started THE CIVIL WAR and  NOTHING ABOUT THAT IS FRIVOLOUS. Just like them BUCK BREAKING ME  When I asked Judge Schwall to recuse himself, The EVIL STATE OF GEORGIA locked me up for over a month on the floor of the FULTON COUNTY JAIL and denied me my GOUT Medications. I almost DIED. I peeled in front of SCHWALL with my mangled forearm from the Gout and Assistan District Attorney made fun of how my arm look from the GOUT (EXHIBIT 1C) it's in the record so I'm sending you a copy of it so you won't tell me how FRIVOLOUS it is for a BLACK MAN the GRANDSON OF A  SLSLAVE OWNER that's right my mother's father was the son of a slave OWNER. SCWAL told me he locked me up because he thought I would drive drunk again. I told him you've  had over four years to prove that LIE to be true. So do me a favor just take my CDL LICENSES JUST DON'T PUT ME BACK IN JAIL  on that FLOOR IN YOUR FULTON COUNTY JAIL, I need to go to the doctor you can see my arm you can see what you've done  to m, he laughed at me he wanted to take out Vengeance for what Brian Nichols did on me even though he did it illegally just like you're dismissing my cases as FRIVOLOUS. Is it legal in the eyes of God and man and in the Constitution I demand to have my day in court

6. Later in 2011 I went back in front of Judge CRAIG SCHWALL, after he suspended my CDL driver's license I had an attorney with me this time the same attorney who took my case pro bono against the city of Roswell Police Department for aggravated sexual abuse kidnapping and torture but a black female judge said I was guilty Public intoxication. Because her black behind didn't listen to the evidence for my 911 call that I made after the police assault me. THE white police woman Erin Johnson suck my penis and the homosexual James Spivey SODOMIZED MY BUTTHOLE. The white police Female officer how Sucked my penis, took me outside naked before she took me to jail naked, She Grabbed my penis in front of little black and Mexican Children's because she called them ANIMAL'S ANYWAY (Roswell Georgia Police female white  officer ERIN JOHNSON). Attorney Scott Hall was with me when SCHWALL said he was going to put my black ass back in jail and wait for a trial I said damn I already been waiting 5 years how long is it going to take for y'all to give me a day in court if I'm in jail you got to remember judge  I got two sons their mama died when they were six and three or eight and five I was all they had and y'all lock me up because y'all didn't want people to know that police separated my shoulder while I was in the back of the car complying with everything they said and then WESCOTT tried to kill me. after a car wreck and then you assaulted me. Don't  keep doing this retaliatory  Violations of OATH of offices  you and your Sworn United States Federal Enforcers of the LAW . You  took me outside naked and threatened to shoot my son and then said  I made a terrorist threat do your job let the jury decision be the final say and your bias PREFERENCE Continue to cover up the felonious misconduct of your  Confederates Continue to destroy my constitutional civil,  Human and constitutional rights be Violated. This happened to me because in America you WHITE Supremacist Massacred one Township of black people After Another and you would never made to take accountability for it (Exhibit 1B) Because of the severity and the  child molesting racist dishonorable Injustice. My child was injured in a car wreck the

judge put the case off for five years The District Attorney office knew the judge was violating his oath of office when he said I didn't deserve a trial The District Attorney office New the key witness in the case Jackson Westcott was guilty of perjury in a trial that preceded this one they knew they didn't have a case for like so many black men they decided to make me pay anyway for what another black man did and it's wrong it's against the law it rape molested and retarded too innocent children and I'm here please to a man that got six children I'm here pleasing to a man who said he became a lawyer and a judge because Justice took that his heart the way I feel right now I don't believe Justice took that your heart I believed white supremacy that's your heart out of you so you couldn't be found in partial and treat All American citizens equally under the color of the law but that being the case I will continue to work to get my citizenship restored to be released from the Fulton County Georgia enslavement and seat amended monetary relief in the amount of $ 7 million and Punitive Damages in the amount of $ 7 Million. I want you to remember something my son is a junior at the age of 12 proved himself to be a child prodigy Not only was he playing piano creating song and playing them with their band from the age of 12 to 14 when it all ended when some filthy racist white dog ran a red light and a mad dog wearing a police uniform that's right Jason Westcott tried to kill me in a hospital room and what he did to me disqualified any evidence obtained  by Lt. Jason westcott and you and judge Schwall knew it and so did The District Attorney office in Paul Highway. My son would have made millions in baseball he was going to professional baseball from high school my son is 33 now and never finished the 10th grade because of that car accident and mostly because I was not able to care for him because you evil sick white child molesting racist God less evil Lecherous, treacherous, treasonous traitors to your oath to protect the Constitution and the constitutional rights of American citizens that's why I'm asking for a trial by jury and a speedy trial and I'm asking the judge if me complaining about the police assaulting me by sucking my dick f****** in my ass and taking me to jail naked and then lying on the witness stand and getting a judge to help lie  and hide evidence and then listen to him say they don't have it it's frivolous Georgia's 7code 2.15 so you supposed to report any misconduct have you recorded it at all my motion picture the Crenshaw production The Whistleblower by Willie J Mitchell AKA Pablo Crenshaw is copyrighted in the Library of Congress and I'm adding new episodes  all the time because Justice musk prevail because no one is above the law and no one is below the law. None of my other complaints were frivolous because they violated the oath of office and them violating that oath cause me not to be able to run my business and it damaged my brain and it continues to damage my brand the commercial professional licenses for my endorsements and other legal rights that will legally taken from me and made me a slave without due process that is not frivolous the only way or judge in Georgia would call this complaint frivolous is he was raised to be a white supremacist and that white supremacist give him the preference not to obey Georgia Code 2.15 to report these criminal acts by the lawyers and judges and it also makes you a Violator of your oath of office Georgia Code 2.15 tell what they did to the proper authorities I hope you're not a white supremacist who was Ways by white supremacists who's raising white supremacists but right now the other four judges even the black one violated due process and violated the oath of office and the accounting on you to continue to hide the ugly racist real-time slavery practice that you're doing the innocent black people stop it in the name of justice for all not just the white Americans who still think that they are superior to black people especially with my sister working that same building you and problem on the same floor Prosecuting the drug cartels for this country with the justice department you ought to be ashamed of your damn self but I doubt it cuz you a white man and I'm black this was retaliatory because Brian Nichols killed them people in the Fulton County Courthouse and they lied and said I said I was going to do the same thing and without due process I was brutally beaten down to the

ground by Chris Wall when he locked me up and then the terroristic bastard threatening to finish the job if I didn't take a plea and I had two motherless children to care for God is the real judge do the right thing because anything other than my day in court in front of a jury with a judge being the referee and not the Executioner like Chris Wall is an Abomination and should be damned to hell for Generations.

RESPECTFULLY YOURS

WILLIE J. MITCHELL  SR. (PRO-SE)

3326 Anton St

Apt # 113

Whistler, AL 36612

PH⊗251)509-6263

Williemitchell1516@yahoo.com

# IN THE UNITED STATE DISTRICTS COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

WILLIE J. MITCHELL SR (Pro-Se)

Plaintiff,

Vs,

CIVIL CASE ACTION  NO:

THE STATE OF GEORGIA

FULTON COUNTY DISTRICT ATTORNEY

PAUL HOWARD ASSISTANT DISTRICT

ATTORNEY  LINDA DUNCOSKI

SUPERIOR COURT JUDGE

CRAIG SCHWALL  CITY OF

ROSWELL GEORGIA POLICE DEPARTMENT

LT.JASON WESCOTT SANDYSPRINGS

GEORGIA POLICE DEPARTMENT

Defendants,

## AFFIIDAVIT OF SERVICE

Comes now on this the 13 day of June, 2025 that I the plaintiff Willie J Mitchell  do hereby serve a copy of to the above named defendants via the United States postal services at their addresses listed below.  Respectful Yours

Willie J Mitchell Sr.(Pro-Se)

3326 Anton St

# 113

Whistler, AL  36612

PH(251)509-6263

Williemitchell1516@yahoo.com

Apt

UNITED STATE ATTORNEY

THEODORE S. HERTZBERG

Richard B. Russell Federal Building

75 Ted Turner Dr, SW

Suite 600

August, GA 30303-3309


UNITED STATES JUSTICE DEPARTMENT

ATTORNEY GENERAL CHRISTOPHER CARR

40 Capitol Square SW

Atlanta, GA 3033 4


Judge Craig SCHWALL

185 Central Ave SW #3755

Atlanta, GA 30303 /


Fulton County District Attorney Office

Attention Former District Attorney

Paul Howard and Assistant DA

Linda Dunkoski

136 Pryor Street SW 3rd Floor

Atlanta, GA 30303 /


City of Roswell Georgia

Police Department and Lt.Jason westcott

39 Hill St

Roswell, GA 30075 /

Sandy Spring Police
Internal Affairs Department
7840 Roswell Rd #301
Sandy Spring, GA 30350

EX AB



Meet the team



**Robyn C. Mitchell**
CCO

Robyn Mitchell is the senior vice president and chief compliance officer for North American Bancard, LLC. In her role, Robyn strategically leads an enterprise-level team responsible for regulatory compliance, card brand/sponsor bank compliance and relationship management, and exam and audit management.

Prior to joining NAB, Robyn served as director and CCO for payments, regulatory affairs, and state money transmitter licensing at Intuit. She was also the senior director and CCO for ebay's Global Marketplaces and led Global Resiliency. Other roles have included chief privacy officer and CCO for both Bank of America Merchant Services and RBS WorldPay (US), AML and privacy compliance executive for Bank of America's Consumer & Commercial Banks, and assistant general counsel with Bank of America.

Prior to entering the corporate arena, Robyn was a senior associate/partner for 12 years in private practice, where she represented clients in financial services and other regulated industries.

In addition to her work in the private and corporate sectors, Robyn is a former Trial Attorney with the United States Department of Justice, as well as Assistant United States Attorney assigned to the Presidential Organized Crime Southeastern Drug Enforcement Task Force. Robyn received her Bachelors of Science Degree from Alabama State University. She also holds a Juris Doctorate from Howard University. Robyn is certified by ACAMS as an anti-money laundering compliance specialist.

Exhibit TA-B-C 5



**U.S. Department of Homeland Security**
Intelligence and Analysis
Springfield, VA 20598

**Transportation
Security
Administration**

February 16, 2024

WILLIE MITCHELL
2104 WOLF RIDGE RD APT 25
WHISTLER, AL 36612-1654

Re: Preliminary Determination of Ineligibility, HME Application, Case Number: 11634655

Dear WILLIE MITCHELL:

The Transportation Security Administration (TSA) has received your application for a Hazardous Materials Endorsement (HME). After review of the information received as a result of your application, TSA has made a preliminary determination that you might not be eligible for an HME because of your criminal history, pursuant to Title 49, Code of Federal Regulations (C.F.R.), sections 1572.103(a), (b), and/or (c) (for criminal offenses), as described below:

**Convictions:**

Terroristic Threats and Acts, in Fulton County, Georgia, on or about February 17, 2011, and sentenced to serve three years probation supervision.

**If you were not convicted of a disqualifying offense or you were convicted a long time ago, you** *may* **qualify for an appeal.** See the enclosed General Instructions for Criminal Disqualifications, Section 1, regarding *appeals.*

**If the information above is correct, you may be able to obtain an HME in some cases.** See the enclosed General Instructions for Criminal Disqualifications, Section 2, regarding *waivers.*

If you cannot tell whether you should apply for an appeal or a waiver, you may request both. Read the enclosed directions carefully before applying for an appeal or a waiver.

You may also request the releasable materials on which TSA has based its preliminary determination of ineligibility. To do so, please check the appropriate box on the enclosed HME Response Cover Sheet and return it to TSA.

**In any case, you must reply within 60 days from the date you receive this letter. You may send TSA the necessary documents or submit a request for an extension of time to reply. If you do not reply within 60 days or receive an extension of time from TSA, TSA's preliminary determination of ineligibility will become final and** *you will not be granted an HME.*

Even if your application is finally denied, you may submit a new application for an HME *at any time.*

A copy of the enclosed HME Response Cover Sheet should be included with all documents you send to TSA. Please review the enclosures, which provide detailed instructions on how to submit information to TSA. If you have questions, please write to us at the address provided.

For more information, you can also visit the HME home page on the internet at:
https://www.tsa.gov/for-industry/hazmat-endorsement.

Sincerely,

Susanna Pike
Adjudication Branch Manager
Security Threat Assessment Division
Intelligence and Analysis
Transportation Security Administration

Enclosures

## GENERAL INSTRUCTIONS FOR CRIMINAL DISQUALIFICATIONS

1.  **THE FACTS IN THE PRELIMINARY DETERMINATION OF INELIGIBILITY ARE INCORRECT (I want to *Appeal* the Preliminary Determination of Ineligibility)**

If you believe you were not convicted of a disqualifying offense, you may appeal TSA's preliminary determination of ineligibility.

You may also appeal TSA's preliminary determination of ineligibility if you were convicted of *some* disqualifying offenses more than 7 years ago, and were released from incarceration more than 5 years ago (if you were incarcerated). <u>See the enclosed list for these disqualifying offenses.</u>

**You must request your appeal in writing by filling out the enclosed HME Response Cover Sheet. You must submit your appeal or request an extension of time within 60 days from the date you receive this letter. Along with the cover sheet, you should send official documents to show:**

- The open warrant issued for a disqualifying criminal offense was issued in error, has been resolved, or did not result in a disqualifying felony criminal conviction;
- You are no longer under indictment for a disqualifying felony criminal offense;
- You were convicted of a misdemeanor or lesser offense, were found not guilty, or the charges were dismissed with no remaining legal restrictions;
- The conviction was overturned on appeal, or expunged so that it has been removed from your criminal record and carries no disabilities or legal restrictions (except for future sentencing purposes);
- You were allowed to withdraw a plea of guilty or *nolo contendere* and enter a plea of not guilty, and the case was later dismissed;
- For *some, but not all felony convictions* (see list of disqualifying offenses), you were released from incarceration more than 5 years before you filed your application and the conviction was incurred more than 7 years before you filed your application; or
- You received a *full* pardon (restoring all rights) for the disqualifying criminal conviction.

TSA should notify you whether your appeal has been granted within 60 days after receiving your request, or a longer period of time for good cause.

2.  **I HAVE A DISQUALIFYING CONVICTION BUT I HAVE BEEN REHABILITATED AND I AM ELIGIBLE TO HOLD AN HME (I am requesting a *Waiver* of the Preliminary Determination of Ineligibility)**

If you were convicted of a disqualifying offense, you may still be able to obtain an HME by requesting a waiver.

**You must submit your request for a waiver in writing by filling out the enclosed HME Response Cover Sheet. You must submit your waiver request or request an extension of**

time within 60 days from the date you receive this letter. Along with the cover sheet, you should send documents to show that you have rehabilitated yourself, as provided in the five waiver criteria (49 C.F.R. section 1515.7), and that you are eligible to hold an HME. The kinds of documents you should submit include, but are not limited to:

- An explanation of the circumstances of the disqualifying offense(s);
- Official documents showing any restitution ordered, restitution paid, and the balance due;
- Any Federal or state mitigation remedies (such as certificates showing completion of court-ordered substance abuse or other treatment programs);
- Court records or official medical release documents indicating that you no longer lack mental capacity (if you were found not guilty by reason of insanity);
- Official court documents regarding the offense and the disposition of your case (e.g., indictment, judgment of conviction, and sentencing documents);
- Official documents demonstrating the completion of all terms of your sentence (including the date of release from incarceration, date of discharge from supervision, etc.);
- A letter from your probation and/or parole officer discussing compliance while under supervision (including any violations);
- Letters of recommendation from past and present employers;
- Character reference letters from friends, family members or co-workers;
- Performance appraisals, certificates of achievement or accomplishments, etc.; and
- Any other information you believe would aid TSA in determining whether you are eligible for a waiver.

TSA should notify you whether your request for a waiver has been granted or denied within 60 days after receiving your request, if you provided all of the necessary information. The decision may take longer than 60 days if additional information is required for TSA to render a decision.

3.    I WANT TO KNOW WHAT INFORMATION TSA USED TO MAKE ITS PRELIMINARY DETERMINATION OF INELIGIBILITY

You may request copies of the information and documents (*Releasable Materials*) that TSA used to determine that you might not be eligible to hold an HME. You must submit your request for Releasable Materials by filling out the enclosed HME Response Cover Sheet. You do *not* need to give any explanation for your request.

TSA will normally give you a copy of the Releasable Materials no later than 60 days after receiving your request. For good cause, TSA may take longer. TSA does not disclose classified information, as defined in Executive Order 12968, Section 1.1(d), and TSA reserves the right not to disclose any other information or material that is protected from disclosure under law or that TSA did not use in making its preliminary determination of ineligibility.

4.    I NEED MORE TIME TO PREPARE MY REQUEST FOR AN APPEAL, MY REQUEST FOR A WAIVER, OR MY REQUEST FOR RELEASABLE MATERIALS

If you need additional time in which to submit a request for documents, materials, information, a waiver, or an appeal, you may ask for an extension of time. You must submit your request for an extension of time by filling out the enclosed HME Response Cover Sheet. You must submit your request within 60 days from the date you receive this letter. Your first request

### DISQUALIFYING CRIMINAL OFFENSES

If you have pleaded guilty or *nolo contendere* to a Disqualifying Offense, TSA treats the case in the same way as if you had been convicted of the offense, even if the court withheld or deferred adjudication of guilt.

TSA does not consider you to have been convicted if the finding of guilt was overturned on appeal, pardoned (with full restoration of all rights), or expunged so that it has been removed from your criminal record and carries no disabilities or restrictions (except for future sentencing purposes).

If you are under want, warrant, complaint or indictment for a Disqualifying Offense, you will be disqualified until the want or warrant is released or the complaint or indictment is dismissed.

If you were found not guilty by reason of insanity or incompetent to stand trial, you will be disqualified until you provide proof that you no longer lack mental capacity.

| | |
|---|---|
| If you have been convicted of one of these felonies, you may be eligible for an *appeal* if:<br><br>• You were convicted more than 7 years before you applied for your HME; and<br><br>• You were released from incarceration more than 5 years before you applied for your HME (if applicable).<br><br>■■■■■■■■■■■■■■■■■■■■■■■■■<br><br>If you were convicted less than 7 years before the date of your application or released from incarceration less than 5 years before the date of your application, you may apply for a *waiver*. | • Unlawful possession, use, sale, manufacture, purchase, distribution, receipt, transfer, shipping, transporting, delivery, import, export of, or dealing in a firearm or other weapon. A firearm or other weapon includes, but is not limited to, firearms as defined in Title 18, United States Code (U.S.C.), section 921(a)(3) or 26 U.S.C. section 5845(a), or items contained on the U.S. Munitions Import List in Title 27, Code of Federal Regulations (C.F.R.), section 447.21;<br>• Extortion;<br>• Dishonesty, fraud, or misrepresentation, including identity fraud and money laundering where the money laundering is related to a crime described in paragraphs (a) or (b) of this section. Welfare fraud and passing bad checks do not constitute dishonesty, fraud, or misrepresentation for purposes of this paragraph;<br>• Bribery;<br>• Smuggling;<br>• Immigration violations;<br>• Distribution of, possession with intent to distribute, or importation of a controlled substance;<br>• Arson;<br>• Kidnapping or hostage taking;<br>• Rape or aggravated sexual abuse;<br>• Assault with intent to kill;<br>• Robbery;<br>• Fraudulent entry into a seaport as described in 18 U.S.C. section 1036, or a comparable State law;<br>• Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. section 1961, *et seq.*, or a comparable State law, other than the violations listed in paragraph (a)(10) of this section; and/or<br>• Conspiracy or attempt to commit any of the above crimes. |

| | |
|---|---|
| If you have been convicted of one of these felonies, you are not eligible for an appeal, but you may request a waiver (*see* enclosed waiver instructions): | • A crime involving a transportation security incident. A transportation security incident is a security incident resulting in a significant loss of life, environmental damage, transportation system disruption, or economic disruption in a particular area, as defined in 46 U.S.C. section 70101. The term "economic disruption" does not include a work stoppage or other employee-related action not related to terrorism and resulting from an employer-employee dispute; <br><br> • Improper transportation of a hazardous material under 49 U.S.C. section 5124, or a State law that is comparable; <br><br> • Unlawful possession, use, sale, distribution, manufacture, purchase, receipt, transfer, shipping, transporting, import, export, storage of, or dealing in an explosive or explosive device. An explosive or explosive device includes, but is not limited to, an explosive or explosive material as defined in 18 U.S.C. sections 232(5), 841(c) through 841(f), and 844(j); and a destructive device, as defined in 18 U.S.C. section 921(a)(4) and 26 U.S.C. section 5845(f); <br><br> • Murder; <br><br> • Making any threat, or maliciously conveying false information knowing the same to be false, concerning the deliverance, placement, or detonation of an explosive or other lethal device in or against a place of public use, a state or government facility, a public transportations system, or an infrastructure facility; <br><br> • Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. section 1961, *et seq.*, or a comparable State law, where one of the predicate acts found by a jury or admitted by the defendant, consists of one of the crimes listed in paragraph (a) of this section; and/or <br><br> • Conspiracy or attempt to commit the above crimes. |
| If you have been convicted of one of these felonies, you cannot receive an HME. You are not eligible for an appeal, and you may not request a waiver. | • Espionage, or conspiracy to commit espionage; <br><br> • Sedition, or conspiracy to commit sedition; <br><br> • Treason, or conspiracy to commit treason; <br><br> • A federal crime of terrorism as defined in 18 U.S.C. section 2332b(g), or comparable State law, or conspiracy to commit such crime; and/or <br><br> • Attempt to commit the above crimes. |

for an extension of time will be granted automatically, which will give you an additional 60 days to submit your request for an appeal or a waiver.

If you need more than one extension of time, you must submit another request in writing to TSA, and you will be notified of the new date by which you must provide documents to TSA in support of your request for an appeal or a waiver.

If the time period to submit a request for documents, materials, information, a waiver, or an appeal has expired, you may send a *written* request to explain why the failure to respond within the time limit was excusable. TSA will grant an extension of time after the expiration of the time period if good cause is shown, and will notify you of the new date by which you must provide documents to TSA.

5.    HOW TO SEND DOCUMENTS TO TSA

Before submitting your HME Response Cover Sheet, please make sure that your printed name and address are correct. If they are not, please make any necessary corrections and be sure to include a telephone number where you can be reached during the day.

DOCUMENTS MAY BE MAILED VIA U.S. POSTAL SERVICE TO THE ADDRESS PROVIDED ON THE HME RESPONSE COVER SHEET.

If you use an overnight mail service, make sure that the mail carrier delivers to a Post Office Box. Currently, only the U.S. Postal Service delivers to Post Office Boxes. In addition to Express Mail, you may also write to TSA using registered, certified, priority, or regular mail.

Using the enclosed HME Response Cover Sheet and mailing documents to the address on the cover sheet is the fastest way to communicate with TSA.

Emancipation Proclamation in 1863. (⌐
Walker/The Boston Globe via Getty ⌐

## POST-1865: AN EVOLUTION

Since the Thirteenth Amendment's passage in 1865, its exception clause has enabled slavery ⌐
punitive systems. Following the Civil War, many southern states imposed Black Codes: la⌐
requiring apprenticeships and labor contracts for employment, often with former owners ⌐
established systems of convict leasing and vagrancy laws, which incentivized the arrest, inca⌐.
enslavement of Black people. These laws criminalized poverty, unemployment, and homelessne⌐
of former owners of enslaved people following emancipation.

Jim Crow laws, which have their roots in Black Codes, further entrenched systems of apartheid for Black ⌐
aspect of life in the post-Reconstruction era, including the criminal justice system. These laws legalized raci⌐
throughout public life and were further ingrained through the establishment of the "separate but equal" doctrin⌐
Supreme Court in _Plessy v. Ferguson_. For Black Americans, noncompliance with Jim Crow laws was often met wi⌐
— and violations of these laws and subsequent arrests could result simply from eating at a kitchen counter or enterin⌐
space through the front door.

Following the end of the Jim Crow era, the War on Drugs fueled mass incarceration by disproportionately filling America's pri⌐
with Black Americans (Black men, in particular) and enforcing racial control through the criminal justice system. This resulted in⌐
redesign of America's racial caste system that nominally adhered to the principle of colorblindness following the fall of Jim Crow.
Indeed, author and civil rights litigator Michelle Alexander has described this phenomenon as "the New Jim Crow."

These are not just dark legacies of the past, however. Today, there are still incarcerated Black Americans picking crops on
plantations across the country. Regardless of whether it's through agricultural work or otherwise, the prison labor system creates a
lack of control over one's labor and freedom — particularly for Black people. It's no surprise, then, to find that in some states,
incarcerated workers are not paid at all.

Figure 1

👤 = 50 persons

# Average Rate of Black, Latinx and White Imprisonment Per 100,000 Residents

**White** 👤👤👤👤👤      **261**

**Latino** 👤👤👤👤👤👤      **349**

**Black** 👤👤👤👤👤👤👤👤👤👤👤👤👤👤👤👤👤👤👤👤👤👤👤👤      **1240**

Black Americans are incarcerated in state prisons at nearly 5 times the rate of white Americans.

DATA SOURCE: Carson, E. A. (2021). Prisoners in 2019. Bureau of Justice Statistics; U.S. Census Bureau (n.d.). Age, sex, race, and Hispanic-origin—6 race groups. (SC EST 2019-ALLDATA).

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director

**Registration Number**

## TX 9-367-952

**Effective Date of Registration:**
October 02, 2023

**Registration Decision Date:**
March 08, 2024

---

## Title

**Title of Work:** Crenshaw Production a video audio book The WhistleBlower by Willie J Mitchell aka Pablo Crenshaw

## Completion/Publication

**Year of Completion:** 2023
**Date of 1st Publication:** June 06, 2023

## Author

**Author:** Willie J. Mitchell aka Pablo Crenshaw
**Author Created:** motion picture
**Work made for hire:** No
**Citizen of:** United States
**Year Born:** 1956
**Anonymous:** No
**Pseudonymous:** No

## Copyright Claimant

**Copyright Claimant:** Willie J. Mitchell
2104 Wolf Ridge Rd Apt #25, Whistler, AL, 36612

## Limitation of copyright claim

**Previously registered:** No

## Certification

**Name:** Willie J Mitchell
**Date:** September 23, 2023

Page 1 of 2

# Mitchell, Willie J

MRN: E529009

**Robert M Hulick, MD**
Physician
Orthopedics

Op Note
Signed

Date of Service: 9/18/2024 11:17 AM



Gulf Orthopaedics

**Operative Report**

**9/18/2024**

**Willie J Mitchell**
**311039177**

**Pre Op Dx**: Severe left hip osteoarthritis

**Post Op Dx: Same**

**Procedure:** Left total hip arthroplasty via an anterior approach

**Indications:** Willie J Mitchell is a very pleasant 68 y.o. male that has had longstanding arthritis in the left hip. he has failed conservative management including injections, anti-inflammatories, physical therapy. he has elected to proceed with total hip arthroplasty via an anterior approach.

**Findings:**
Intra-articular findings include : Severe degenerative changes to both the femoral head and acetabulum
Bone quality was judged to be excellent

**Surgeon:** Robert M Hulick, MD I performed this entire procedure from start to finish

**Assistants:** Wesley Carter CRNP was present from before the case started to the end of the case. He was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He also helped ensure an excellent closure of the wound.

**Anesthesia:** SAR

**IVF:** See anesthesia record

**UOP:** See anesthesia record

**Estimated Blood Loss: See anesthesia record**

**Implants:**
**DePuy Actis femoral stem size 9 high offset**
**DePuy ceramic femoral head size 36, +8 mm offset**
**DePuy GRIPTION acetabular shell, 58 mm outside diameter**
**DePuy neutral acetabular polyethylene liner**

**Explants:** None

**Cultures:** None

**Specimens:** None

**Complications:** None

**Counts:** Correct at end of procedure

**Drains:** None

**Procedure Note:** The patient was met preoperatively and all relevant risks and benefits were again discussed. After informed consent was obtained patient was taken to the operating room and underwent general anesthesia without issue. Patient was subsequently placed in supine position and all bony prominences were well-padded. The left lower extremity was prepped and draped in sterile fashion. A preoperative timeout was performed with the circulating nurse, surgeon, and operative team to confirm correct patient, planned procedure, and laterality. When all were in agreement, we proceeded with the planned procedure.

**Operative Narrative:**

Wesley Carter CRNP was present from before the case started to the end of the case. He was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He also helped ensure an excellent closure of the wound.

After obtaining informed consent for the surgery, the risks and benefits of the surgery were explained in detail to the patient and family. The risks include infection, nerve damage, excessive bleeding, the need for transfusion and the risks associated with transfusion, blood vessel damage, loss of limb and amputation, failure of the prosthesis, failure of implant and need for revision arthroplasty, persistent pain, reflex sympathetic dystrophy and/or regional complex pain syndrome, leg length discrepancy, fracture, stiffness and loss of motion, instability, soft tissue impingement and persistent pain, peripheral nerve damage in both upper and/or lower extremities secondary to positioning, Bovie burn, skin and/or wound breakdown due to positioning, DVT, PE, risks associated with anesthesia, coronary arrest, death, progressive and/or accelerated degeneration of the opposite compartment. The patient and family stated they fully understand the risks and benefits of surgery and wish to proceed with surgery to include left total hip arthroplasty

The patient was identified in the pre-operative holding area. Chart review was performed, and the operative site marked with patient confirmation. The patient was then brought to the operative room, and placed in the supine position. Anesthesia was administered, and the patient was transferred to the HANA Hip Operating Table, with both feet placed in boots, and the padded perineal post positioned carefully. Preoperative antibiotics and transexamic acid were given. Sterile prepping and draping was then performed for surgery on the marked hip using an alcohol/iodine prep, and an occlusive drape. A preoperative timeout was performed with the circulating nurse, surgeon, and operative team to confirm correct patient, planned procedure, and laterality. When all were in agreement, we proceeded with the planned procedure.

Approximately 10cm incision was then on the anterolateral hip surface, 3 centimeters lateral and 1 centimeter distal to the ASIS, overlying the TFL muscle belly. Soft tissue dissection was performed down to the anterior fascia of the hip. An incision was made in the lateral aspect of the TFL muscle fascia. Blunt finger dissection was then down between the TFL and the sartorious muscle bellies down to the anterior hip capsule. A blunt Hohmann retractor was placed over the superior femoral neck. Sharp dissection with Metzenbaum scissors was then used to open the fascia overlying the rectus femoris and vastus lateralis.

The ascending branch of the lateral femoral circumflex artery and its accompanying veins were identified and coagulated with Bovie electrocautery. The rectus femoris and iliocapsularis were then elevated off the anterior hip capsule and a double bent Hohmann retractor was placed over the anterior rim of the acetabulum. A blunt Hohmann retractor was then placed inferior to the femoral neck and capsule. Blunt Hohman retractors were placed above and below the femoral neck and it's capsule. A capsulotomy was then performed along the lateral border of the anterior capsule from the top to the bottom of the femoral neck. The capsule was then freed from the anterior neck, and joint fluid removed with suction. A transverse incision in the capsule was then performed along the base of the femoral neck. The capsular flaps were then tagged with 0 Vicryl. The blunt Hohmann retractors were then placed intracapsular superior and inferior to the femoral neck.

The hip was then externally rotated 15 degrees with 2 turns of traction on the Hana table. At this point, 2 osteotomies were performed on the femoral neck, one at the base of the head, and one at the base of the superior femoral neck. The hip was externally rotated once again to 30 degrees, and the "napkin ring" segment of femoral neck was removed with a Cobb elevator, and larger rongeur. The corkscrew was then placed, rotating the femoral head several times, causing avulsion of the ligamentum teres. The femoral head was then removed.

Traction was removed, and retractors were placed over the anterior and posterior rims of the acetabulum, giving exposure to the cup. Any additional inferior capsule attached to the inferior neck was released. Once exposure was obtained, the labrum and foveal contents were removed with bovie, and deep pickups. Any overhanging osteophytes were removed with an osteotome and mallet. Reamer was then used to medialize the acetabulum down to the base of the fovea. Great care was taken not to over ream and over medialize with this reamer. Sequential reaming was then performed to 58 millimeters with hemispherical reamers, to the point that all the cartilage, and irregular surfaces were removed. The screening was done under the guidance of fluoroscopy to ensure appropriate abduction angle, version, and overall orientation. Once the reaming was completed, a 58 millimeter acetabular cup was impacted into the acetabulum under fluoroscopy, aiming for approximately 40 degrees of abduction, and 15 degrees of anteversion. Once the cup impaction was completed, a neutral offset polyethylene liner was placed into the cup, and impacted into place. The 2 retractors were then removed.

Lack of traction was confirmed. The hip was fully externally rotated, extended to the floor, and adducted underneath the other foot. The traction arm was checked to ensure that there was no unexpected traction on the leg. A retractor was placed medially, and another one placed over the tip of the trochanter. The superior capsule was excised down the lateral femoral neck to the trochanter. Careful release of the remaining capsule was performed around the femoral neck until appropriate mobilization occurred, and the femoral hook was elevated slightly to enhance exposure. Broaching was done carefully so as to not cause a fracture in the femoral calcar. Sequential broaching was performed to a size 9. Trials were then performed with different femoral necks, and head ball neck lengths. The C-Arm was used during the trial reductions checking canal fill, leg length and hip offset. Adjustments in implant size were made as needed based on information from the navigation system. A size Actis 9 high offset stem was chosen, and impacted into the femur. The femoral calcar was carefully inspected to ensure there was no fracture. A 36 millimeter ceramic head ball with +8 neck length was chosen, and attached to the femoral stem, then impacted into place. All retractors were removed. The hip was then reduced, and a final fluoroscopic imaging was obtained to ensure appropriate implant placement.

Thorough irrigation of the surgical site was performed. The soft tissues were inspected for any discrete bleeding. The anterior hip capsule was repaired. The muscles were allowed to fall back into position. The anterior fascia was closed with #2 strata fix, subcutaneous tissues closed with 2-0 Monocryl, and skin closed with 3-0 strata fix. Prineo skin glue system followed by silver bearing dressing were then applied. At the conclusion of the case all counts are correct. The patient was then awakened from general anesthesia and transported to the postoperative care area having tolerated procedure well

Postoperatively: The patient will be on 24 hours of overnight antibiotics. Multimodal pain control regimen has been initiated. Patient will mobilize with physical therapy as quickly as possible with plan for discharge on postoperative day 1. Graduated compression stockings, sequential compression device, and aspirin 81 mg twice daily for 5 weeks for DVT Ppx. Weightbearing as tolerated, anterior precautions. PT to evaluate patient for any discharge disposition needs, CM/SW to assist with any discharge disposition needs. Patient will follow-up with me in clinic in 2 weeks for wound evaluation.

A 22 modifier has been added to this procedure secondary to the work performed was significantly greater than that usually performed for this procedure.

Due to the patient's BMI of 35 and significant musculature of the thigh, the patient required at least double the number of assistants for preoperative positioning, sterile preparation and drape of the injured extremity, and to hold retractors intraoperatively. The subcutaneous fat and significant musculature of the thigh required significant effort to retract, in addition to prolonged dissection with increased blood loss secondary to vascularity of the subcutaneous fat. The additional time incurred for this procedure was estimated to be 1.5 hours

Copies of preoperative and postoperative radiographs are available upon request and I would be happy to speak with designated representative regarding this modifier if necessary to further explain the difficultly of the procedure undertaken far outside the normal spectrum for the listed CPT codes.

**Compliations:** None

**Specimens:** None

**Estimated Blood Loss:** 300-400

**VTE Prophylaxis:** As ordered postop

**Disposition:** PACU

MD interpretation of fluoroscopy directly necessary intraoperatively in order to assess alignment and fixation stability. This was a dynamic process involving interpretation of the fracture pattern, reduction of the fracture, and safe implant placement. Additionally, final fluoroscopic evaluation was used to determine restoration of length, alignment, and rotation. These factors were directly assessed based on my evaluation of the fluoroscopic images.

**Disposition:** Postoperatively: The patient will be on 24 hours of overnight antibiotics. Multimodal pain control regimen has been initiated. Patient will mobilize with physical therapy as quickly as possible with plan for discharge on postoperative day 1. Graduated compression stockings, sequential compression device, and aspirin 81 mg twice daily for 5 weeks for DVT Ppx. Weightbearing as tolerated, anterior precautions. PT to evaluate patient for any discharge disposition needs, CM/SW to assist with any discharge disposition needs. Patient will follow-up with me in clinic in 2 weeks for wound evaluation.

Electronically signed by Robert M Hulick, MD at 9/18/2024 11:21 AM

Admission (Discharged) on 9/18/2024   *Note shared with patient*

## Care Timeline

09/18  Admitted (Observation) 0534
0534
09/18  LEFT HIP ARTHROPLASTY (TOTAL) ANTERIOR
0708
09/20  Discharged 1420
1420

# Mitchell, Willie J



**Robert M Hulick, MD**
Physician
Orthopedics

Op Note
Addendum

Date of Service: 3/5/2025 11:05 AM



Gulf Orthopaedics

**Operative Note**

**Date of surgery: 03/05/25**

**Pre-procedure Diagnosis:**    Right knee osteoarthritis

**Post-procedure Diagnosis:** same as pre-op diagnosis

**Procedure Performed:**
Right Total Knee arthroplasty

**Anesthesia:** Spinal

**Surgeon: R. Miles Hulick**
   **Assistant(s): M. Wesley Carter CNRP** was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He also helped ensure an excellent closure of the wound.

**Operative Narrative:**
After obtaining informed consent for the surgery, the risks and benefits of the surgery were explained in detail to the patient and family. The risks include infection, nerve damage, excessive bleeding, the need for transfusion and the risks associated with transfusion, blood vessel damage, loss of limb and amputation, failure of the prosthesis, failure of implant and need for revision total knee arthroplasty, persistent pain, reflex sympathetic dystrophy and/or regional complex pain syndrome, leg length discrepancy, fracture, stiffness and loss of motion, instability, soft tissue impingement and persistent pain, peripheral nerve damage in both upper and/or lower extremities secondary to positioning, Bovie burn, skin and/or wound breakdown due to positioning, DVT, PE, risks associated with anesthesia, coronary arrest, death, progressive and/or accelerated degeneration of the opposite compartment. The patient and family stated they fully understand the risks and benefits of surgery and wish to proceed with surgery to include left total knee arthroplasty.

   The patient was identified in the Pre-Op Holding area. Chart review was performed, and the operative site was marked, with the patient's confirmation, with my initials. The patient was then brought to the operative suite, and placed in the supine position. Anesthesia was administered. All bony prominences were padded. The operative leg was then prepped using an alcohol/iodine prep solution, and then draped in the usual sterile fashion with drapes, and an occlusive wrap over the incision site. The foot was

then positioned with the help of a sand bag. 1g of transexamic acid was administered.

Time out procedure was then called, with concurrence of the anesthetist, circulating nurse, and myself as to the surgical site, surgery to be performed, and pre-operative antibiotics given. The tourniquet was then applied.

A straight anterior midline incision was made from just below the tibial tubercle to an inch or so above the superior pole of the patella. Appropriate skin flaps were developed. A para-patellar arthrotomy was performed, and extended along the medial border of the patellar tendon. Any vessel lumens, or bleeding points were treated with the bovie device.

Intra-articular findings include : severe degenerative changes, eburnated bone medially, genu varus, and flexion contracture.

With the knee in extension the patella was mobilized by fat pad excision, and removal of synovium from the periphery of the patella, exposing the quad and patellar tendon insertions. The patella was then subluxed laterally as the knee was brought into flexion. Due to the significant tightness of the knee with limited soft tissue excursion, I first cut the patella to free up more space and placed the metal protection button.

The deep fibers of the medial collateral ligament were released from the medial aspect of the tibia, and underlying osteophytes were removed with a rongeur. Due to the significant varus deformity of the knee, the medial peel was taken further posteriorly to the midline of the tibia to release more of the superficial MCL. The anterior and posterior cruciate ligaments were excised. The medial and lateral menisci were removed with a bovie with care taken to not damage the collateral ligaments, and popliteal tendon. The bovie was used to cauterize the bed of the lateral meniscus to catch the artery entrance there.

OrthAlign was used to resect the proximal tibia preferentially in 1 to 2 degrees of varus to open the medial compartment. Additionally a medial reduction osteotomy was performed excising excess medial tibia in an effort to create more space in the medial compartment.

Similarly, OrthAlign navigation guides and the Depuy guides were used to resect the distal femur for a size 7 cruciate retaining femoral component. Posterior osteophytes were removed with a curved osteotome, and the posterior joint space was searched for loose bodies.

Then, I punched the proximal tibia appropriately for a size 7 tibial component, Depuy fixed bearing design. Spurs were then removed to the level of the trials, on both the femoral and tibial sides with a rongeur. Due to the severity of the deformity as well as the patient's overall size I elected to place a short stem on the tibial component. The tibial component was reamed to allow for 50 mm stem. Eburnated bone was "aerated" with a drill point to aid with cementation.

With the trial femoral and tibial components in place, trials of inserts were performed, demonstrating the 5 mm insert to be the correct size. During the trials fine points of ligamentous balancing were performed with additional releases as needed, and excision of redundant synovium. The lateral retinaculum was also inspected, with release of the synovium which bound the retinaculum to the lateral femoral condyle and to the popliteus.

The patella was then osteotomized parallel to its anterior surface with an oscillating saw, leaving a 13 mm thick wafer of bone. It was then sized, and drilled appropriately for a 35 mm patellar component. A patella trial was applied to the cut surface of the patella.

At the completion of the trials, range of motion, stability and alignment were all excellent.

Once all the balancing procedures were complete, the trial components were removed. 40mL of local anesthetic was placed in the posterior capsule and surrounding tissues. Aspiration was performed prior to injection posteriorly to ensure that blood vessels were avoided. All cut bony surfaces were cleansed with a jet driven irrigation device, using irrigation fluid. The femoral, tibial and patellar surfaces were then sequentially cleaned and dried. The femoral component was placed without cement and tibial components were placed with cement.

The knee was then placed into extension, and the patellar component was cemented in, using the patellar clamp to apply continuous pressure. Excess cement was removed with a Freer elevator and curettes. The cement was allowed to harden. The insert trial was removed, and replaced with the real insert, which was locked into place. Range of motion, and stability checking were once again performed, and were excellent.

Thorough irrigation of the surgical site was performed with normal saline solution. A final look for bleeding points was repeated. The retinaculum was then closed, starting with a figure of 8 stitch of #1 vicryl, placed just proximal to the patella. The retinaculum was then closed with #2 Quill suture, in a running fashion with over-sewing. The soft tissues were then closed with 2-0 monocryl and 3-0 stratafix in running subcuticular fashion. A silver bearing dressing was applied, with an Ace Wrap/TED hose applied from the toes to the upper thigh. The tourniquet was deflated during the procedure. The patient was then awakened from anesthesia, and transferred to the stretcher.

IMPLANTS:
Depuy Attune Femur size 7 cementless
DePuy attune tibia size 7 fixed-bearing, 50 mm stem
DePuy attune patella size 35
DePuy attune tibial insert size 7 x 5 mm

A 22 modifier will be applied to this case secondary to the significant increase in complexity due to the patient's pre-existing significant varus deformity necessitating alteration in bony cuts including preferential varus tibia resection as well as a medial tibial reduction osteotomy and additional medial peel to free up the MCL and allow for a stable extension gap. Additionally, the patient's overall size and limited soft tissue excursion significantly increased the complexity and time required for this case. Overall additional time required for this case over 1 hour

**Complications:** None

**Specimens:** None

**Estimated Blood Loss:** less than 50 ml

**VTE Prophylaxis:** As ordered post-op

**Disposition:** Postoperatively, patient will be taken to the postoperative care area. Will plan for admission to 23-hour observation. Patient will work with physical therapy today at least once, possibly twice pending timing and staff availability. Patient will work with physical therapy again tomorrow at least once prior to discharge. Aspirin 81 mg twice daily for DVT prophylaxis. Follow-up with me in 2 weeks in Mobile

Electronically signed by *No name on file* 3/5/2025 11:05 AM

Electronically signed by Robert M Hulick, MD at 3/5/2025 4:12 PM

Admission (Discharged) on 3/5/2025    *Note shared with patient*

## Care Timeline

03/05 ◆ Admitted (Observation) 0545
0545

03/05 ◆ RIGHT TOTAL KNEE REPLACEMENT
,0703

03/05 ◆ Discharged 1420
1420

# Responsible Party Ledger

**Saraland Smiles**
1097 Industrial Parkway, Ste. E
Saraland, AL 36571
Ph : 251-675-3070

| | |
|---|---|
| Date : | 4/15/2025 |
| Account # : | 90057171 |
| Account Balance : | 2,312.00 |
| Billing Type : | Collection |
| Office # : | SRL305 |

WILLIE  MITCHELL
2104 WOLF RIDGE RD
APT 18
WHISTLER, AL 36612

Tuesday, April 15, 2025

| Date | Chart# | Patient Name | Th | Surf | Prdr | Code | Description | Charges | Credits | Curr. Bal. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Previous Balance** | 20.00 | | |
| 6/15/2023 | | Mitchell, Willie | | | 1351 | PP010 | PMT PAT-Direct Deposit... | | -20.00 | 0.00 |
| | | Mitchell, Willie | 18 | | 0950 | D6740 | Retainer Crown - Porce... | 781.00 | | 781.00 |
| | | Mitchell, Willie | 19 | | 0950 | D6245 | Pontic Porcelain/Ceram... | 778.00 | | 1,559.00 |
| | | Mitchell, Willie | 20 | | 0950 | D6740 | Retainer Crown - Porce... | 781.00 | | 2,340.00 |
| | | Mitchell, Willie | | | 1351 | D1110 | Prophylaxis - Adult | 64.00 | | 2,404.00 |
| | | Mitchell, Willie | | | 1351 | D1206 | Topical Application Of... | 29.00 | | 2,433.00 |
| 6/16/2023 | | Mitchell, Willie | | | MDP-AL | CLM-P | Pri Claim - Sent (2433.00) Closed: 06/27/2023 | | 0.00 | 2,433.00 |
| 6/24/2023 | | Mitchell, Willie | | | *** | PINS8 | PMT INS - ERA 835 (Dos:06/15/23) | | -29.00 | 2,404.00 |
| 7/7/2023 | | Mitchell, Willie | | | 0950 | PP010 | PMT PAT-Direct Deposit... | | -92.00 | 2,312.00 |
| | | Mitchell, Willie | 18 | | 0950 | ZD0101 | Deliver Bridge | 0.00 | | 2,312.00 |
| | | | | | | | **Total :** | **2,433.00** | **-141.00** | |

Account Balance  as of  7/7/2023      : 2,312.00

Summary :

| | |
|---|---|
| Total Charges : | 2,433.00 |
| Total Payments : | -141.00 |
| Total Adjustments : | 0.00 |

| Family Member Balances as of:  7/7/2023 | |
|---|---|
| Willie  Mitchell : | 2,312.00 |

YTD Charges : 2,765.00      YTD Pat Payments :  112.00      YTD Ins Payments :  341.00

# Mitchell, Willie J

MRN: E529009



**Robert M Hulick, MD**
Physician
Orthopedics

Op Note
Signed

Date of Service: 9/18/2024 11:17 AM



Gulf Orthopaedics

**Operative Report**

**9/18/2024**

**Willie J Mitchell**
**311039177**

**Pre Op Dx**: Severe left hip osteoarthritis

**Post Op Dx: Same**

**Procedure:** Left total hip arthroplasty via an anterior approach

**Indications:** Willie J Mitchell is a very pleasant 68 y.o. male that has had longstanding arthritis in the left hip. he has failed conservative management including injections, anti-inflammatories, physical therapy. he has elected to proceed with total hip arthroplasty via an anterior approach.

**Findings:**
Intra-articular findings include : Severe degenerative changes to both the femoral head and acetabulum Bone quality was judged to be excellent

**Surgeon:** Robert M Hulick, MD I performed this entire procedure from start to finish

**Assistants:** Wesley Carter CRNP was present from before the case started to the end of the case. He was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He also helped ensure an excellent closure of the wound.

**Anesthesia:** SAR

**IVF:** See anesthesia record

**UOP:** See anesthesia record

**Estimated Blood Loss: See anesthesia record**

**Implants:**
**DePuy Actis femoral stem size 9 high offset**
**DePuy ceramic femoral head size 36, +8 mm offset**
**DePuy GRIPTION acetabular shell, 58 mm outside diameter**
**DePuy neutral acetabular polyethylene liner**

**Explants:** None

**Cultures:** None

**Specimens:** None

**Complications:** None

**Counts:** Correct at end of procedure

**Drains:** None

**Procedure Note:** The patient was met preoperatively and all relevant risks and benefits were again discussed. After informed consent was obtained patient was taken to the operating room and underwent general anesthesia without issue. Patient was subsequently placed in supine position and all bony prominences were well-padded. The left lower extremity was prepped and draped in sterile fashion. A preoperative timeout was performed with the circulating nurse, surgeon, and operative team to confirm correct patient, planned procedure, and laterality. When all were in agreement, we proceeded with the planned procedure.

**Operative Narrative:**

Wesley Carter CRNP was present from before the case started to the end of the case. He was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He also helped ensure an excellent closure of the wound.

After obtaining informed consent for the surgery, the risks and benefits of the surgery were explained in detail to the patient and family. The risks include infection, nerve damage, excessive bleeding, the need for transfusion and the risks associated with transfusion, blood vessel damage, loss of limb and amputation, failure of the prosthesis, failure of implant and need for revision arthroplasty, persistent pain, reflex sympathetic dystrophy and/or regional complex pain syndrome, leg length discrepancy, fracture, stiffness and loss of motion, instability, soft tissue impingement and persistent pain, peripheral nerve damage in both upper and/or lower extremities secondary to positioning, Bovie burn, skin and/or wound breakdown due to positioning, DVT, PE, risks associated with anesthesia, coronary arrest, death, progressive and/or accelerated degeneration of the opposite compartment. The patient and family stated they fully understand the risks and benefits of surgery and wish to proceed with surgery to include left total hip arthroplasty

The patient was identified in the pre-operative holding area. Chart review was performed, and the operative site marked with patient confirmation. The patient was then brought to the operative room, and placed in the supine position. Anesthesia was administered, and the patient was transferred to the HANA Hip Operating Table, with both feet placed in boots, and the padded perineal post positioned carefully. Preoperative antibiotics and transexamic acid were given. Sterile prepping and draping was then performed for surgery on the marked hip using an alcohol/iodine prep, and an occlusive drape. A preoperative timeout was performed with the circulating nurse, surgeon, and operative team to confirm correct patient, planned procedure, and laterality. When all were in agreement, we proceeded with the planned procedure.

Approximately 10cm incision was then on the anterolateral hip surface, 3 centimeters lateral and 1 centimeter distal to the ASIS, overlying the TFL muscle belly. Soft tissue dissection was performed down to the anterior fascia of the hip. An incision was made in the lateral aspect of the TFL muscle fascia. Blunt finger dissection was then down between the TFL and the sartorious muscle bellies down to the anterior hip capsule. A blunt Hohmann retractor was placed over the superior femoral neck. Sharp dissection with Metzenbaum scissors was then used to open the fascia overlying the rectus femoris and vastus lateralis.

The ascending branch of the lateral femoral circumflex artery and its accompanying veins were identified and coagulated with Bovie electrocautery. The rectus femoris and iliocapsularis were then elevated off the anterior hip capsule and a double bent Hohmann retractor was placed over the anterior rim of the acetabulum. A blunt Hohmann retractor was then placed inferior to the femoral neck and capsule. Blunt Hohman retractors were placed above and below the femoral neck and it's capsule. A capsulotomy was then performed along the lateral border of the anterior capsule from the top to the bottom of the femoral neck. The capsule was then freed from the anterior neck, and joint fluid removed with suction. A transverse incision in the capsule was then performed along the base of the femoral neck. The capsular flaps were then tagged with 0 Vicryl. The blunt Hohmann retractors were then placed intracapsular superior and inferior to the femoral neck.

The hip was then externally rotated 15 degrees with 2 turns of traction on the Hana table. At this point, 2 osteotomies were performed on the femoral neck, one at the base of the head, and one at the base of the superior femoral neck. The hip was externally rotated once again to 30 degrees, and the "napkin ring" segment of femoral neck was removed with a Cobb elevator, and larger rongeur. The corkscrew was then placed, rotating the femoral head several times, causing avulsion of the ligamentum teres. The femoral head was then removed.

Traction was removed, and retractors were placed over the anterior and posterior rims of the acetabulum, giving exposure to the cup. Any additional inferior capsule attached to the inferior neck was released. Once exposure was obtained, the labrum and foveal contents were removed with bovie, and deep pickups. Any overhanging osteophytes were removed with an osteotome and mallet. Reamer was then used to medialize the acetabulum down to the base of the fovea. Great care was taken not to over ream and over medialize with this reamer. Sequential reaming was then performed to 58 millimeters with hemispherical reamers, to the point that all the cartilage, and irregular surfaces were removed. The screening was done under the guidance of fluoroscopy to ensure appropriate abduction angle, version, and overall orientation. Once the reaming was completed, a 58 millimeter acetabular cup was impacted into the acetabulum under fluoroscopy, aiming for approximately 40 degrees of abduction, and 15 degrees of anteversion. Once the cup impaction was completed, a neutral offset polyethylene liner was placed into the cup, and impacted into place. The 2 retractors were then removed.

Lack of traction was confirmed. The hip was fully externally rotated, extended to the floor, and adducted underneath the other foot. The traction arm was checked to ensure that there was no unexpected traction on the leg. A retractor was placed medially, and another one placed over the tip of the trochanter. The superior capsule was excised down the lateral femoral neck to the trochanter. Careful release of the remaining capsule was performed around the femoral neck until appropriate mobilization occurred, and the femoral hook was elevated slightly to enhance exposure. Broaching was done carefully so as to not cause a fracture in the femoral calcar. Sequential broaching was performed to a size 9. Trials were then performed with different femoral necks, and head ball neck lengths. The C-Arm was used during the trial reductions checking canal fill, leg length and hip offset. Adjustments in implant size were made as needed based on information from the navigation system. A size Actis 9 high offset stem was chosen, and impacted into the femur. The femoral calcar was carefully inspected to ensure there was no fracture. A 36 millimeter ceramic head ball with +8 neck length was chosen, and attached to the femoral stem, then impacted into place. All retractors were removed. The hip was then reduced, and a final fluoroscopic imaging was obtained to ensure appropriate implant placement.

Thorough irrigation of the surgical site was performed. The soft tissues were inspected for any discrete bleeding. The anterior hip capsule was repaired. The muscles were allowed to fall back into position. The anterior fascia was closed with #2 strata fix, subcutaneous tissues closed with 2-0 Monocryl, and skin closed with 3-0 strata fix. Prineo skin glue system followed by silver bearing dressing were then applied. At the conclusion of the case all counts are correct. The patient was then awakened from general anesthesia and transported to the postoperative care area having tolerated procedure well

Postoperatively: The patient will be on 24 hours of overnight antibiotics. Multimodal pain control regimen has been initiated. Patient will mobilize with physical therapy as quickly as possible with plan for discharge on postoperative day 1. Graduated compression stockings, sequential compression device, and aspirin 81 mg twice daily for 5 weeks for DVT Ppx. Weightbearing as tolerated, anterior precautions. PT to evaluate patient for any discharge disposition needs, CM/SW to assist with any discharge disposition needs. Patient will follow-up with me in clinic in 2 weeks for wound evaluation.

A 22 modifier has been added to this procedure secondary to the work performed was significantly greater than that usually performed for this procedure.

Due to the patient's BMI of 35 and significant musculature of the thigh, the patient required at least double the number of assistants for preoperative positioning, sterile preparation and drape of the injured extremity, and to hold retractors intraoperatively. The subcutaneous fat and significant musculature of the thigh required significant effort to retract, in addition to prolonged dissection with increased blood loss secondary to vascularity of the subcutaneous fat. The additional time incurred for this procedure was estimated to be 1.5 hours

Copies of preoperative and postoperative radiographs are available upon request and I would be happy to speak with designated representative regarding this modifier if necessary to further explain the difficultly of the procedure undertaken far outside the normal spectrum for the listed CPT codes.

**Compliations:** None

**Specimens:** None

**Estimated Blood Loss:** 300-400

**VTE Prophylaxis:** As ordered postop

**Disposition:** PACU

MD interpretation of fluoroscopy directly necessary intraoperatively in order to assess alignment and fixation stability. This was a dynamic process involving interpretation of the fracture pattern, reduction of the fracture, and safe implant placement. Additionally, final fluoroscopic evaluation was used to determine restoration of length, alignment, and rotation. These factors were directly assessed based on my evaluation of the fluoroscopic images.

**Disposition:** Postoperatively: The patient will be on 24 hours of overnight antibiotics. Multimodal pain control regimen has been initiated. Patient will mobilize with physical therapy as quickly as possible with plan for discharge on postoperative day 1. Graduated compression stockings, sequential compression device, and aspirin 81 mg twice daily for 5 weeks for DVT Ppx. Weightbearing as tolerated, anterior precautions. PT to evaluate patient for any discharge disposition needs, CM/SW to assist with any discharge disposition needs. Patient will follow-up with me in clinic in 2 weeks for wound evaluation.

Electronically signed by Robert M Hulick, MD at 9/18/2024 11:21 AM

Admission (Discharged) on 9/18/2024 *Note shared with patient*

## Care Timeline

| | |
|---|---|
| 09/18 0534 | Admitted (Observation) 0534 |
| 09/18 0708 | LEFT HIP ARTHROPLASTY (TOTAL) ANTERIOR |
| 09/20 1420 | Discharged 1420 |

# Mitchell, Willie J

MRN: E529009



**Robert M Hulick, MD**
Physician
Orthopedics

Op Note  
Addendum

Date of Service: 3/5/2025 11:05 AM

Gulf Orthopaedics

### Operative Note

**Date of surgery: 03/05/25**

**Pre-procedure Diagnosis:** Right knee osteoarthritis

**Post-procedure Diagnosis:** same as pre-op diagnosis

**Procedure Performed:**
Right Total Knee arthroplasty

**Anesthesia:** Spinal

**Surgeon: R. Miles Hulick**
  **Assistant(s): M. Wesley Carter CNRP** was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He also helped ensure an excellent closure of the wound.

**Operative Narrative:**
After obtaining informed consent for the surgery, the risks and benefits of the surgery were explained in detail to the patient and family. The risks include infection, nerve damage, excessive bleeding, the need for transfusion and the risks associated with transfusion, blood vessel damage, loss of limb and amputation, failure of the prosthesis, failure of implant and need for revision total knee arthroplasty, persistent pain, reflex sympathetic dystrophy and/or regional complex pain syndrome, leg length discrepancy, fracture, stiffness and loss of motion, instability, soft tissue impingement and persistent pain, peripheral nerve damage in both upper and/or lower extremities secondary to positioning, Bovie burn, skin and/or wound breakdown due to positioning, DVT, PE, risks associated with anesthesia, coronary arrest, death, progressive and/or accelerated degeneration of the opposite compartment. The patient and family stated they fully understand the risks and benefits of surgery and wish to proceed with surgery to include left total knee arthroplasty.

  The patient was identified in the Pre-Op Holding area. Chart review was performed, and the operative site was marked, with the patient's confirmation, with my initials. The patient was then brought to the operative suite, and placed in the supine position. Anesthesia was administered. All bony prominences were padded. The operative leg was then prepped using an alcohol/iodine prep solution, and then draped in the usual sterile fashion with drapes, and an occlusive wrap over the incision site. The foot was

then positioned with the help of a sand bag. 1g of transexamic acid was administered.

Time out procedure was then called, with concurrence of the anesthetist, circulating nurse, and myself as to the surgical site, surgery to be performed, and pre-operative antibiotics given. The tourniquet was then applied.

A straight anterior midline incision was made from just below the tibial tubercle to an inch or so above the superior pole of the patella. Appropriate skin flaps were developed. A para-patellar arthrotomy was performed, and extended along the medial border of the patellar tendon. Any vessel lumens, or bleeding points were treated with the bovie device.

Intra-articular findings include : severe degenerative changes, eburnated bone medially, genu varus, and flexion contracture.

With the knee in extension the patella was mobilized by fat pad excision, and removal of synovium from the periphery of the patella, exposing the quad and patellar tendon insertions. The patella was then subluxed laterally as the knee was brought into flexion. Due to the significant tightness of the knee with limited soft tissue excursion, I first cut the patella to free up more space and placed the metal protection button.

The deep fibers of the medial collateral ligament were released from the medial aspect of the tibia, and underlying osteophytes were removed with a rongeur. Due to the significant varus deformity of the knee, the medial peel was taken further posteriorly to the midline of the tibia to release more of the superficial MCL. The anterior and posterior cruciate ligaments were excised. The medial and lateral menisci were removed with a bovie with care taken to not damage the collateral ligaments, and popliteal tendon. The bovie was used to cauterize the bed of the lateral meniscus to catch the artery entrance there.

OrthAlign was used to resect the proximal tibia preferentially in 1 to 2 degrees of varus to open the medial compartment. Additionally a medial reduction osteotomy was performed excising excess medial tibia in an effort to create more space in the medial compartment.

Similarly, OrthAlign navigation guides and the Depuy guides were used to resect the distal femur for a size 7 cruciate retaining femoral component. Posterior osteophytes were removed with a curved osteotome, and the posterior joint space was searched for loose bodies.

Then, I punched the proximal tibia appropriately for a size 7 tibial component, Depuy fixed bearing design. Spurs were then removed to the level of the trials, on both the femoral and tibial sides with a rongeur. Due to the severity of the deformity as well as the patient's overall size I elected to place a short stem on the tibial component. The tibial component was reamed to allow for 50 mm stem. Eburnated bone was "aerated" with a drill point to aid with cementation.

With the trial femoral and tibial components in place, trials of inserts were performed, demonstrating the 5 mm insert to be the correct size. During the trials fine points of ligamentous balancing were performed with additional releases as needed, and excision of redundant synovium. The lateral retinaculum was also inspected, with release of the synovium which bound the retinaculum to the lateral femoral condyle and to the popliteus.

The patella was then osteotomized parallel to its anterior surface with an oscillating saw, leaving a 13 mm thick wafer of bone. It was then sized, and drilled appropriately for a 35 mm patellar component. A patella trial was applied to the cut surface of the patella.

At the completion of the trials, range of motion, stability and alignment were all excellent.

Once all the balancing procedures were complete, the trial components were removed. 40mL of local anesthetic was placed in the posterior capsule and surrounding tissues. Aspiration was performed prior to injection posteriorly to ensure that blood vessels were avoided. All cut bony surfaces were cleansed with a jet driven irrigation device, using irrigation fluid. The femoral, tibial and patellar surfaces were then sequentially cleaned and dried. The femoral component was placed without cement and tibial components were placed with cement.

The knee was then placed into extension, and the patellar component was cemented in, using the patellar clamp to apply continuous pressure. Excess cement was removed with a Freer elevator and curettes. The cement was allowed to harden. The insert trial was removed, and replaced with the real insert, which was locked into place. Range of motion, and stability checking were once again performed, and were excellent.

Thorough irrigation of the surgical site was performed with normal saline solution. A final look for bleeding points was repeated. The retinaculum was then closed, starting with a figure of 8 stitch of #1 vicryl, placed just proximal to the patella. The retinaculum was then closed with #2 Quill suture, in a running fashion with over-sewing. The soft tissues were then closed with 2-0 monocryl and 3-0 stratafix in running subcuticular fashion. A silver bearing dressing was applied, with an Ace Wrap/TED hose applied from the toes to the upper thigh. The tourniquet was deflated during the procedure. The patient was then awakened from anesthesia, and transferred to the stretcher.

IMPLANTS:
Depuy Attune Femur size 7 cementless
DePuy attune tibia size 7 fixed-bearing, 50 mm stem
DePuy attune patella size 35
DePuy attune tibial insert size 7 x 5 mm

A 22 modifier will be applied to this case secondary to the significant increase in complexity due to the patient's pre-existing significant varus deformity necessitating alteration in bony cuts including preferential varus tibia resection as well as a medial tibial reduction osteotomy and additional medial peel to free up the MCL and allow for a stable extension gap. Additionally, the patient's overall size and limited soft tissue excursion significantly increased the complexity and time required for this case. Overall additional time required for this case over 1 hour

**Complications:** None

**Specimens:** None

**Estimated Blood Loss:** less than 50 ml

**VTE Prophylaxis:** As ordered post-op

**Disposition:** Postoperatively, patient will be taken to the postoperative care area. Will plan for admission to 23-hour observation. Patient will work with physical therapy today at least once, possibly twice pending timing and staff availability. Patient will work with physical therapy again tomorrow at least once prior to discharge. Aspirin 81 mg twice daily for DVT prophylaxis. Follow-up with me in 2 weeks in Mobile

Electronically signed by *No name on file* 3/5/2025 11:05 AM

Electronically signed by Robert M Hulick, MD at 3/5/2025 4:12 PM

Admission (Discharged) on 3/5/2025    *Note shared with patient*

## Care Timeline

03/05
0545 — Admitted (Observation) 0545

03/05
0703 — RIGHT TOTAL KNEE REPLACEMENT

03/05
1420 — Discharged 1420

# Responsible Party Ledger

**Saraland Smiles**
1097 Industrial Parkway, Ste. E
Saraland, AL 36571
Ph : 251-675-3070

| | |
|---|---|
| Date : | 4/15/2025 |
| Account # : | 90057171 |
| Account Balance : | 2,312.00 |
| Billing Type : | Collection |
| Office # : | SRL305 |

WILLIE  MITCHELL
2104 WOLF RIDGE RD
APT 18
WHISTLER, AL 36612

Tuesday, April 15, 2025

| Date | Chart# | Patient Name | Th | Surf | Prdr | Code | Description | Charges | Credits | Curr. Bal. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Previous Balance** | 20.00 | | |
| 6/15/2023 | | Mitchell, Willie | | | 1351 | PP010 | PMT PAT-Direct Deposit... | | -20.00 | 0.00 |
| | | Mitchell, Willie | 18 | | 0950 | D6740 | Retainer Crown - Porce... | 781.00 | | 781.00 |
| | | Mitchell, Willie | 19 | | 0950 | D6245 | Pontic Porcelain/Ceram... | 778.00 | | 1,559.00 |
| | | Mitchell, Willie | 20 | | 0950 | D6740 | Retainer Crown - Porce... | 781.00 | | 2,340.00 |
| | | Mitchell, Willie | | | 1351 | D1110 | Prophylaxis - Adult | 64.00 | | 2,404.00 |
| | | Mitchell, Willie | | | 1351 | D1206 | Topical Application Of... | 29.00 | | 2,433.00 |
| 6/16/2023 | | Mitchell, Willie | | | MDP-AL | CLM-P | Pri Claim - Sent (2433.00) Closed: 06/27/2023 | | 0.00 | 2,433.00 |
| 6/24/2023 | | Mitchell, Willie | | | *** | PINS8 | PMT INS - ERA 835 (Dos:06/15/23) | | -29.00 | 2,404.00 |
| 7/7/2023 | | Mitchell, Willie | | | 0950 | PP010 | PMT PAT-Direct Deposit... | | -92.00 | 2,312.00 |
| | | Mitchell, Willie | 18 | | 0950 | ZD0101 | Deliver Bridge | 0.00 | | 2,312.00 |
| | | | | | | | **Total :** | 2,433.00 | -141.00 | |

**Account Balance as of  7/7/2023    : 2,312.00**

**Summary :**

| | |
|---|---|
| Total Charges : | 2,433.00 |
| Total Payments : | -141.00 |
| Total Adjustments : | 0.00 |

| Family Member Balances as of:  7/7/2023 | |
|---|---|
| Willie  Mitchell : | 2,312.00 |

**YTD Charges : 2,765.00**    **YTD Pat Payments :  112.00**    **YTD Ins Payments : 341.00**

# Mitchell, Willie J

MRN: E529009



**Robert M Hulick, MD**
Physician
Orthopedics

Op Note
Signed

Date of Service: 9/18/2024 11:17 AM



Gulf Orthopaedics

## Operative Report

**9/18/2024**

**Willie J Mitchell**
**311039177**

**Pre Op Dx**: Severe left hip osteoarthritis

**Post Op Dx: Same**

**Procedure:** Left total hip arthroplasty via an anterior approach

**Indications:** Willie J Mitchell is a very pleasant 68 y.o. male that has had longstanding arthritis in the left hip. he has failed conservative management including injections, anti-inflammatories, physical therapy. he has elected to proceed with total hip arthroplasty via an anterior approach.

**Findings:**
Intra-articular findings include : Severe degenerative changes to both the femoral head and acetabulum
Bone quality was judged to be excellent

**Surgeon:** Robert M Hulick, MD I performed this entire procedure from start to finish

**Assistants:** Wesley Carter CRNP was present from before the case started to the end of the case. He was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He  also helped ensure an excellent closure of the wound.

**Anesthesia:** SAR

**IVF:** See anesthesia record

**UOP:** See anesthesia record

**Estimated Blood Loss: See anesthesia record**

**Implants:**
**DePuy Actis femoral stem size 9 high offset**
**DePuy ceramic femoral head size 36, +8 mm offset**
**DePuy GRIPTION acetabular shell, 58 mm outside diameter**
**DePuy neutral acetabular polyethylene liner**

**Explants:** None

**Cultures:** None

**Specimens:** None

**Complications:** None

**Counts:** Correct at end of procedure

**Drains:** None

**Procedure Note:** The patient was met preoperatively and all relevant risks and benefits were again discussed. After informed consent was obtained patient was taken to the operating room and underwent general anesthesia without issue. Patient was subsequently placed in supine position and all bony prominences were well-padded. The left lower extremity was prepped and draped in sterile fashion. A preoperative timeout was performed with the circulating nurse, surgeon, and operative team to confirm correct patient, planned procedure, and laterality. When all were in agreement, we proceeded with the planned procedure.

**Operative Narrative:**

Wesley Carter CRNP was present from before the case started to the end of the case. He was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He also helped ensure an excellent closure of the wound.

After obtaining informed consent for the surgery, the risks and benefits of the surgery were explained in detail to the patient and family. The risks include infection, nerve damage, excessive bleeding, the need for transfusion and the risks associated with transfusion, blood vessel damage, loss of limb and amputation, failure of the prosthesis, failure of implant and need for revision arthroplasty, persistent pain, reflex sympathetic dystrophy and/or regional complex pain syndrome, leg length discrepancy, fracture, stiffness and loss of motion, instability, soft tissue impingement and persistent pain, peripheral nerve damage in both upper and/or lower extremities secondary to positioning, Bovie burn, skin and/or wound breakdown due to positioning, DVT, PE, risks associated with anesthesia, coronary arrest, death, progressive and/or accelerated degeneration of the opposite compartment. The patient and family stated they fully understand the risks and benefits of surgery and wish to proceed with surgery to include left total hip arthroplasty

The patient was identified in the pre-operative holding area. Chart review was performed, and the operative site marked with patient confirmation. The patient was then brought to the operative room, and placed in the supine position. Anesthesia was administered, and the patient was transferred to the HANA Hip Operating Table, with both feet placed in boots, and the padded perineal post positioned carefully. Preoperative antibiotics and transexamic acid were given. Sterile prepping and draping was then performed for surgery on the marked hip using an alcohol/iodine prep, and an occlusive drape. A preoperative timeout was performed with the circulating nurse, surgeon, and operative team to confirm correct patient, planned procedure, and laterality. When all were in agreement, we proceeded with the planned procedure.

Approximately 10cm incision was then on the anterolateral hip surface, 3 centimeters lateral and 1 centimeter distal to the ASIS, overlying the TFL muscle belly. Soft tissue dissection was performed down to the anterior fascia of the hip. An incision was made in the lateral aspect of the TFL muscle fascia. Blunt finger dissection was then down between the TFL and the sartorious muscle bellies down to the anterior hip capsule. A blunt Hohmann retractor was placed over the superior femoral neck. Sharp dissection with Metzenbaum scissors was then used to open the fascia overlying the rectus femoris and vastus lateralis.

The ascending branch of the lateral femoral circumflex artery and its accompanying veins were identified and coagulated with Bovie electrocautery. The rectus femoris and iliocapsularis were then elevated off the anterior hip capsule and a double bent Hohmann retractor was placed over the anterior rim of the acetabulum. A blunt Hohmann retractor was then placed inferior to the femoral neck and capsule. Blunt Hohman retractors were placed above and below the femoral neck and it's capsule. A capsulotomy was then performed along the lateral border of the anterior capsule from the top to the bottom of the femoral neck. The capsule was then freed from the anterior neck, and joint fluid removed with suction. A transverse incision in the capsule was then performed along the base of the femoral neck. The capsular flaps were then tagged with 0 Vicryl. The blunt Hohmann retractors were then placed intracapsular superior and inferior to the femoral neck.

The hip was then externally rotated 15 degrees with 2 turns of traction on the Hana table. At this point, 2 osteotomies were performed on the femoral neck, one at the base of the head, and one at the base of the superior femoral neck. The hip was externally rotated once again to 30 degrees, and the "napkin ring" segment of femoral neck was removed with a Cobb elevator, and larger rongeur. The corkscrew was then placed, rotating the femoral head several times, causing avulsion of the ligamentum teres. The femoral head was then removed.

Traction was removed, and retractors were placed over the anterior and posterior rims of the acetabulum, giving exposure to the cup. Any additional inferior capsule attached to the inferior neck was released. Once exposure was obtained, the labrum and foveal contents were removed with bovie, and deep pickups. Any overhanging osteophytes were removed with an osteotome and mallet. Reamer was then used to medialize the acetabulum down to the base of the fovea. Great care was taken not to over ream and over medialize with this reamer. Sequential reaming was then performed to 58 millimeters with hemispherical reamers, to the point that all the cartilage, and irregular surfaces were removed. The screening was done under the guidance of fluoroscopy to ensure appropriate abduction angle, version, and overall orientation. Once the reaming was completed, a 58 millimeter acetabular cup was impacted into the acetabulum under fluoroscopy, aiming for approximately 40 degrees of abduction, and 15 degrees of anteversion. Once the cup impaction was completed, a neutral offset polyethylene liner was placed into the cup, and impacted into place. The 2 retractors were then removed.

Lack of traction was confirmed. The hip was fully externally rotated, extended to the floor, and adducted underneath the other foot. The traction arm was checked to ensure that there was no unexpected traction on the leg. A retractor was placed medially, and another one placed over the tip of the trochanter. The superior capsule was excised down the lateral femoral neck to the trochanter. Careful release of the remaining capsule was performed around the femoral neck until appropriate mobilization occurred, and the femoral hook was elevated slightly to enhance exposure. Broaching was done carefully so as to not cause a fracture in the femoral calcar. Sequential broaching was performed to a size 9. Trials were then performed with different femoral necks, and head ball neck lengths. The C-Arm was used during the trial reductions checking canal fill, leg length and hip offset. Adjustments in implant size were made as needed based on information from the navigation system. A size Actis 9 high offset stem was chosen, and impacted into the femur. The femoral calcar was carefully inspected to ensure there was no fracture. A 36 millimeter ceramic head ball with +8 neck length was chosen, and attached to the femoral stem, then impacted into place. All retractors were removed. The hip was then reduced, and a final fluoroscopic imaging was obtained to ensure appropriate implant placement.

Thorough irrigation of the surgical site was performed. The soft tissues were inspected for any discrete bleeding. The anterior hip capsule was repaired. The muscles were allowed to fall back into position. The anterior fascia was closed with #2 strata fix, subcutaneous tissues closed with 2-0 Monocryl, and skin closed with 3-0 strata fix. Prineo skin glue system followed by silver bearing dressing were then applied. At the conclusion of the case all counts are correct. The patient was then awakened from general anesthesia and transported to the postoperative care area having tolerated procedure well

Postoperatively: The patient will be on 24 hours of overnight antibiotics. Multimodal pain control regimen has been initiated. Patient will mobilize with physical therapy as quickly as possible with plan for discharge on postoperative day 1. Graduated compression stockings, sequential compression device, and aspirin 81 mg twice daily for 5 weeks for DVT Ppx. Weightbearing as tolerated, anterior precautions. PT to evaluate patient for any discharge disposition needs, CM/SW to assist with any discharge disposition needs. Patient will follow-up with me in clinic in 2 weeks for wound evaluation.

A 22 modifier has been added to this procedure secondary to the work performed was significantly greater than that usually performed for this procedure.

Due to the patient's BMI of 35 and significant musculature of the thigh, the patient required at least double the number of assistants for preoperative positioning, sterile preparation and drape of the injured extremity, and to hold retractors intraoperatively. The subcutaneous fat and significant musculature of the thigh required significant effort to retract, in addition to prolonged dissection with increased blood loss secondary to vascularity of the subcutaneous fat. The additional time incurred for this procedure was estimated to be 1.5 hours

Copies of preoperative and postoperative radiographs are available upon request and I would be happy to speak with designated representative regarding this modifier if necessary to further explain the difficulty of the procedure undertaken far outside the normal spectrum for the listed CPT codes.

**Compliations:** None

**Specimens:** None

**Estimated Blood Loss:** 300-400

**VTE Prophylaxis:** As ordered postop

**Disposition:** PACU

MD interpretation of fluoroscopy directly necessary intraoperatively in order to assess alignment and fixation stability. This was a dynamic process involving interpretation of the fracture pattern, reduction of the fracture, and safe implant placement. Additionally, final fluoroscopic evaluation was used to determine restoration of length, alignment, and rotation. These factors were directly assessed based on my evaluation of the fluoroscopic images.

**Disposition:** Postoperatively: The patient will be on 24 hours of overnight antibiotics. Multimodal pain control regimen has been initiated. Patient will mobilize with physical therapy as quickly as possible with plan for discharge on postoperative day 1. Graduated compression stockings, sequential compression device, and aspirin 81 mg twice daily for 5 weeks for DVT Ppx. Weightbearing as tolerated, anterior precautions. PT to evaluate patient for any discharge disposition needs, CM/SW to assist with any discharge disposition needs. Patient will follow-up with me in clinic in 2 weeks for wound evaluation.

Electronically signed by Robert M Hulick, MD at 9/18/2024 11:21 AM

Admission (Discharged) on 9/18/2024   *Note shared with patient*

# Care Timeline

| 09/18 | Admitted (Observation) 0534 |
| 0534 | |
| 09/18 | LEFT HIP ARTHROPLASTY (TOTAL) ANTERIOR |
| 0708 | |
| 09/20 | Discharged 1420 |
| 1420 | |

# Mitchell, Willie J



**Robert M Hulick, MD**
Physician
Orthopedics

Op Note 📝
Addendum

Date of Service: 3/5/2025 11:05 AM



## Gulf Orthopaedics

**Operative Note**

**Date of surgery: 03/05/25**

**Pre-procedure Diagnosis:** Right knee osteoarthritis

**Post-procedure Diagnosis:** same as pre-op diagnosis

**Procedure Performed:**
Right Total Knee arthroplasty

**Anesthesia:** Spinal

**Surgeon: R. Miles Hulick**
  **Assistant(s): M. Wesley Carter CNRP** was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He also helped ensure an excellent closure of the wound.

**Operative Narrative:**
After obtaining informed consent for the surgery, the risks and benefits of the surgery were explained in detail to the patient and family. The risks include infection, nerve damage, excessive bleeding, the need for transfusion and the risks associated with transfusion, blood vessel damage, loss of limb and amputation, failure of the prosthesis, failure of implant and need for revision total knee arthroplasty, persistent pain, reflex sympathetic dystrophy and/or regional complex pain syndrome, leg length discrepancy, fracture, stiffness and loss of motion, instability, soft tissue impingement and persistent pain, peripheral nerve damage in both upper and/or lower extremities secondary to positioning, Bovie burn, skin and/or wound breakdown due to positioning, DVT, PE, risks associated with anesthesia, coronary arrest, death, progressive and/or accelerated degeneration of the opposite compartment. The patient and family stated they fully understand the risks and benefits of surgery and wish to proceed with surgery to include left total knee arthroplasty.

  The patient was identified in the Pre-Op Holding area. Chart review was performed, and the operative site was marked, with the patient's confirmation, with my initials. The · patient was then brought to the operative suite, and placed in the supine position. Anesthesia was administered. All bony prominences were padded. The operative leg was then prepped using an alcohol/iodine prep solution, and then draped in the usual sterile fashion with drapes, and an occlusive wrap over the incision site. The foot was

then positioned with the help of a sand bag. 1g of transexamic acid was administered.

Time out procedure was then called, with concurrence of the anesthetist, circulating nurse, and myself as to the surgical site, surgery to be performed, and pre-operative antibiotics given. The tourniquet was then applied.

A straight anterior midline incision was made from just below the tibial tubercle to an inch or so above the superior pole of the patella. Appropriate skin flaps were developed. A para-patellar arthrotomy was performed, and extended along the medial border of the patellar tendon. Any vessel lumens, or bleeding points were treated with the bovie device.

Intra-articular findings include : severe degenerative changes, eburnated bone medially, genu varus, and flexion contracture.

With the knee in extension the patella was mobilized by fat pad excision, and removal of synovium from the periphery of the patella, exposing the quad and patellar tendon insertions. The patella was then subluxed laterally as the knee was brought into flexion. Due to the significant tightness of the knee with limited soft tissue excursion, I first cut the patella to free up more space and placed the metal protection button.

The deep fibers of the medial collateral ligament were released from the medial aspect of the tibia, and underlying osteophytes were removed with a rongeur. Due to the significant varus deformity of the knee, the medial peel was taken further posteriorly to the midline of the tibia to release more of the superficial MCL. The anterior and posterior cruciate ligaments were excised. The medial and lateral menisci were removed with a bovie with care taken to not damage the collateral ligaments, and popliteal tendon. The bovie was used to cauterize the bed of the lateral meniscus to catch the artery entrance there.

OrthAlign was used to resect the proximal tibia preferentially in 1 to 2 degrees of varus to open the medial compartment. Additionally a medial reduction osteotomy was performed excising excess medial tibia in an effort to create more space in the medial compartment.

Similarly, OrthAlign navigation guides and the Depuy guides were used to resect the distal femur for a size 7 cruciate retaining femoral component. Posterior osteophytes were removed with a curved osteotome, and the posterior joint space was searched for loose bodies.

Then, I punched the proximal tibia appropriately for a size 7 tibial component, Depuy fixed bearing design. Spurs were then removed to the level of the trials, on both the femoral and tibial sides with a rongeur. Due to the severity of the deformity as well as the patient's overall size I elected to place a short stem on the tibial component. The tibial component was reamed to allow for 50 mm stem. Eburnated bone was "aerated" with a drill point to aid with cementation.

With the trial femoral and tibial components in place, trials of inserts were performed, demonstrating the 5 mm insert to be the correct size. During the trials fine points of ligamentous balancing were performed with additional releases as needed, and excision of redundant synovium. The lateral retinaculum was also inspected, with release of the synovium which bound the retinaculum to the lateral femoral condyle and to the popliteus.

The patella was then osteotomized parallel to its anterior surface with an oscillating saw, leaving a 13 mm thick wafer of bone. It was then sized, and drilled appropriately for a 35 mm patellar component. A patella trial was applied to the cut surface of the patella.

At the completion of the trials, range of motion, stability and alignment were all excellent.

Once all the balancing procedures were complete, the trial components were removed. 40mL of local anesthetic was placed in the posterior capsule and surrounding tissues. Aspiration was performed prior to injection posteriorly to ensure that blood vessels were avoided. All cut bony surfaces were cleansed with a jet driven irrigation device, using irrigation fluid. The femoral, tibial and patellar surfaces were then sequentially cleaned and dried. The femoral component was placed without cement and tibial components were placed with cement.

The knee was then placed into extension, and the patellar component was cemented in, using the patellar clamp to apply continuous pressure. Excess cement was removed with a Freer elevator and curettes. The cement was allowed to harden. The insert trial was removed, and replaced with the real insert, which was locked into place. Range of motion, and stability checking were once again performed, and were excellent.

Thorough irrigation of the surgical site was performed with normal saline solution. A final look for bleeding points was repeated. The retinaculum was then closed, starting with a figure of 8 stitch of #1 vicryl, placed just proximal to the patella. The retinaculum was then closed with #2 Quill suture, in a running fashion with over-sewing. The soft tissues were then closed with 2-0 monocryl and 3-0 stratafix in running subcuticular fashion. A silver bearing dressing was applied, with an Ace Wrap/TED hose applied from the toes to the upper thigh. The tourniquet was deflated during the procedure. The patient was then awakened from anesthesia, and transferred to the stretcher.

IMPLANTS:
Depuy Attune Femur size 7 cementless
DePuy attune tibia size 7 fixed-bearing, 50 mm stem
DePuy attune patella size 35
DePuy attune tibial insert size 7 x 5 mm

A 22 modifier will be applied to this case secondary to the significant increase in complexity due to the patient's pre-existing significant varus deformity necessitating alteration in bony cuts including preferential varus tibia resection as well as a medial tibial reduction osteotomy and additional medial peel to free up the MCL and allow for a stable extension gap. Additionally, the patient's overall size and limited soft tissue excursion significantly increased the complexity and time required for this case. Overall additional time required for this case over 1 hour

**Complications:** None

**Specimens:** None

**Estimated Blood Loss:** less than 50 ml

**VTE Prophylaxis:** As ordered post-op

**Disposition:** Postoperatively, patient will be taken to the postoperative care area. Will plan for admission to 23-hour observation. Patient will work with physical therapy today at least once, possibly twice pending timing and staff availability. Patient will work with physical therapy again tomorrow at least once prior to discharge. Aspirin 81 mg twice daily for DVT prophylaxis. Follow-up with me in 2 weeks in Mobile

Electronically signed by *No name on file* 3/5/2025 11:05 AM


Electronically signed by Robert M Hulick, MD at 3/5/2025 4:12 PM


Admission (Discharged) on 3/5/2025    *Note shared with patient*

## Care Timeline



03/05   Admitted (Observation) 0545
0545

03/05   RIGHT TOTAL KNEE REPLACEMENT
0703

03/05   Discharged 1420
1420

# Responsible Party Ledger

**Saraland Smiles**
1097 Industrial Parkway, Ste. E
Saraland, AL 36571
Ph : 251-675-3070

| | |
|---|---|
| Date : | 4/15/2025 |
| Account # : | 90057171 |
| Account Balance : | 2,312.00 |
| Billing Type : | Collection |
| Office # : | SRL305 |

WILLIE  MITCHELL
2104 WOLF RIDGE RD
APT 18
WHISTLER, AL 36612

Tuesday, April 15, 2025

| Date | Chart# | Patient Name | Th | Surf | Prdr | Code | Description | Charges | Credits | Curr. Bal. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Previous Balance** | 20.00 | | |
| 6/15/2023 | | Mitchell, Willie | | | 1351 | PP010 | PMT PAT-Direct Deposit... | | -20.00 | 0.00 |
| | | Mitchell, Willie | 18 | | 0950 | D6740 | Retainer Crown - Porce... | 781.00 | | 781.00 |
| | | Mitchell, Willie | 19 | | 0950 | D6245 | Pontic Porcelain/Ceram... | 778.00 | | 1,559.00 |
| | | Mitchell, Willie | 20 | | 0950 | D6740 | Retainer Crown - Porce... | 781.00 | | 2,340.00 |
| | | Mitchell, Willie | | | 1351 | D1110 | Prophylaxis - Adult | 64.00 | | 2,404.00 |
| | | Mitchell, Willie | | | 1351 | D1206 | Topical Application Of... | 29.00 | | 2,433.00 |
| 6/16/2023 | | Mitchell, Willie | | | MDP-AL | CLM-P | Pri Claim - Sent (2433.00) Closed: 06/27/2023 | | 0.00 | 2,433.00 |
| 6/24/2023 | | Mitchell, Willie | | | *** | PINS8 | PMT INS - ERA 835 (Dos:06/15/23) | | -29.00 | 2,404.00 |
| 7/7/2023 | | Mitchell, Willie | | | 0950 | PP010 | PMT PAT-Direct Deposit... | | -92.00 | 2,312.00 |
| | | Mitchell, Willie | 18 | | 0950 | ZD0101 | Deliver Bridge | 0.00 | | 2,312.00 |
| | | | | | | | **Total :** | 2,433.00 | -141.00 | |

**Account Balance as of  7/7/2023    : 2,312.00**

**Summary :**

| | | |
|---|---|---|
| **Total Charges :** | 2,433.00 | |
| **Total Payments :** | -141.00 | |
| **Total Adjustments :** | 0.00 | |

| Family Member Balances as of:  7/7/2023 |
|---|
| Willie  Mitchell : | 2,312.00 |

**YTD Charges :** 2,765.00    **YTD Pat Payments :**  112.00    **YTD Ins Payments :** 341.00

Mitchell, Willie J (MRN E529009) Encounter Date: 09/18/2024

# Mitchell, Willie J

MRN: E529009



**Robert M Hulick, MD**
Physician
Orthopedics

Op Note 💬
Signed

Date of Service: 9/18/2024 11:17 AM



Gulf Orthopaedics

## Operative Report

**9/18/2024**

**Willie J Mitchell**
**311039177**

**Pre Op Dx**: Severe left hip osteoarthritis

**Post Op Dx: Same**

**Procedure:** Left total hip arthroplasty via an anterior approach

**Indications:** Willie J Mitchell is a very pleasant 68 y.o. male that has had longstanding arthritis in the left hip. he has failed conservative management including injections, anti-inflammatories, physical therapy. he has elected to proceed with total hip arthroplasty via an anterior approach.

**Findings:**
Intra-articular findings include : Severe degenerative changes to both the femoral head and acetabulum
Bone quality was judged to be excellent

**Surgeon:** Robert M Hulick, MD I performed this entire procedure from start to finish

**Assistants:** Wesley Carter CRNP was present from before the case started to the end of the case. He was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He  also helped ensure an excellent closure of the wound.

**Anesthesia:** SAR

**IVF:** See anesthesia record

**UOP:** See anesthesia record

**Estimated Blood Loss: See anesthesia record**

**Implants:**
**DePuy Actis femoral stem size 9 high offset**
**DePuy ceramic femoral head size 36, +8 mm offset**
**DePuy GRIPTION acetabular shell, 58 mm outside diameter**
**DePuy neutral acetabular polyethylene liner**

**Explants:** None

**Cultures:** None

**Specimens:** None

**Complications:** None

**Counts:** Correct at end of procedure

**Drains:** None

**Procedure Note:** The patient was met preoperatively and all relevant risks and benefits were again discussed. After informed consent was obtained patient was taken to the operating room and underwent general anesthesia without issue. Patient was subsequently placed in supine position and all bony prominences were well-padded. The left lower extremity was prepped and draped in sterile fashion. A preoperative timeout was performed with the circulating nurse, surgeon, and operative team to confirm correct patient, planned procedure, and laterality. When all were in agreement, we proceeded with the planned procedure.

**Operative Narrative:**

Wesley Carter CRNP was present from before the case started to the end of the case. He was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He also helped ensure an excellent closure of the wound.

After obtaining informed consent for the surgery, the risks and benefits of the surgery were explained in detail to the patient and family. The risks include infection, nerve damage, excessive bleeding, the need for transfusion and the risks associated with transfusion, blood vessel damage, loss of limb and amputation, failure of the prosthesis, failure of implant and need for revision arthroplasty, persistent pain, reflex sympathetic dystrophy and/or regional complex pain syndrome, leg length discrepancy, fracture, stiffness and loss of motion, instability, soft tissue impingement and persistent pain, peripheral nerve damage in both upper and/or lower extremities secondary to positioning, Bovie burn, skin and/or wound breakdown due to positioning, DVT, PE, risks associated with anesthesia, coronary arrest, death, progressive and/or accelerated degeneration of the opposite compartment. The patient and family stated they fully understand the risks and benefits of surgery and wish to proceed with surgery to include left total hip arthroplasty

The patient was identified in the pre-operative holding area. Chart review was performed, and the operative site marked with patient confirmation. The patient was then brought to the operative room, and placed in the supine position. Anesthesia was administered, and the patient was transferred to the HANA Hip Operating Table, with both feet placed in boots, and the padded perineal post positioned carefully. Preoperative antibiotics and transexamic acid were given. Sterile prepping and draping was then performed for surgery on the marked hip using an alcohol/iodine prep, and an occlusive drape. A preoperative timeout was performed with the circulating nurse, surgeon, and operative team to confirm correct patient, planned procedure, and laterality. When all were in agreement, we proceeded with the planned procedure.

Approximately 10cm incision was then on the anterolateral hip surface, 3 centimeters lateral and 1 centimeter distal to the ASIS, overlying the TFL muscle belly. Soft tissue dissection was performed down to the anterior fascia of the hip. An incision was made in the lateral aspect of the TFL muscle fascia. Blunt finger dissection was then down between the TFL and the sartorious muscle bellies down to the anterior hip capsule. A blunt Hohmann retractor was placed over the superior femoral neck. Sharp dissection with Metzenbaum scissors was then used to open the fascia overlying the rectus femoris and vastus lateralis.

The ascending branch of the lateral circumflex artery and its accompanying veins were identified and coagulated with Bovie electrocautery. The rectus femoris and iliocapsularis were then elevated off the anterior hip capsule and a double bent Hohmann retractor was placed over the anterior rim of the acetabulum. A blunt Hohmann retractor was then placed inferior to the femoral neck and capsule. Blunt Hohman retractors were placed above and below the femoral neck and it's capsule. A capsulotomy was then performed along the lateral border of the anterior capsule from the top to the bottom of the femoral neck. The capsule was then freed from the anterior neck, and joint fluid removed with suction. A transverse incision in the capsule was then performed along the base of the femoral neck. The capsular flaps were then tagged with 0 Vicryl. The blunt Hohmann retractors were then placed intracapsular superior and inferior to the femoral neck.

The hip was then externally rotated 15 degrees with 2 turns of traction on the Hana table. At this point, 2 osteotomies were performed on the femoral neck, one at the base of the head, and one at the base of the superior femoral neck. The hip was externally rotated once again to 30 degrees, and the "napkin ring" segment of femoral neck was removed with a Cobb elevator, and larger rongeur. The corkscrew was then placed, rotating the femoral head several times, causing avulsion of the ligamentum teres. The femoral head was then removed.

Traction was removed, and retractors were placed over the anterior and posterior rims of the acetabulum, giving exposure to the cup. Any additional inferior capsule attached to the inferior neck was released. Once exposure was obtained, the labrum and foveal contents were removed with bovie, and deep pickups. Any overhanging osteophytes were removed with an osteotome and mallet. Reamer was then used to medialize the acetabulum down to the base of the fovea. Great care was taken not to over ream and over medialize with this reamer. Sequential reaming was then performed to 58 millimeters with hemispherical reamers, to the point that all the cartilage, and irregular surfaces were removed. The screening was done under the guidance of fluoroscopy to ensure appropriate abduction angle, version, and overall orientation. Once the reaming was completed, a 58 millimeter acetabular cup was impacted into the acetabulum under fluoroscopy, aiming for approximately 40 degrees of abduction, and 15 degrees of anteversion. Once the cup impaction was completed, a neutral offset polyethylene liner was placed into the cup, and impacted into place. The 2 retractors were then removed.

Lack of traction was confirmed. The hip was fully externally rotated, extended to the floor, and adducted underneath the other foot. The traction arm was checked to ensure that there was no unexpected traction on the leg. A retractor was placed medially, and another one placed over the tip of the trochanter. The superior capsule was excised down the lateral femoral neck to the trochanter. Careful release of the remaining capsule was performed around the femoral neck until appropriate mobilization occurred, and the femoral hook was elevated slightly to enhance exposure. Broaching was done carefully so as to not cause a fracture in the femoral calcar. Sequential broaching was performed to a size 9. Trials were then performed with different femoral necks, and head ball neck lengths. The C-Arm was used during the trial reductions checking canal fill, leg length and hip offset. Adjustments in implant size were made as needed based on information from the navigation system. A size Actis 9 high offset stem was chosen, and impacted into the femur. The femoral calcar was carefully inspected to ensure there was no fracture. A 36 millimeter ceramic head ball with +8 neck length was chosen, and attached to the femoral stem, then impacted into place. All retractors were removed. The hip was then reduced, and a final fluoroscopic imaging was obtained to ensure appropriate implant placement.

Thorough irrigation of the surgical site was performed. The soft tissues were inspected for any discrete bleeding. The anterior hip capsule was repaired. The muscles were allowed to fall back into position. The anterior fascia was closed with #2 strata fix, subcutaneous tissues closed with 2-0 Monocryl, and skin closed with 3-0 strata fix. Prineo skin glue system followed by silver bearing dressing were then applied. At the conclusion of the case all counts are correct. The patient was then awakened from general anesthesia and transported to the postoperative care area having tolerated procedure well

Postoperatively: The patient will be on 24 hours of overnight antibiotics. Multimodal pain control regimen has been initiated. Patient will mobilize with physical therapy as quickly as possible with plan for discharge on postoperative day 1. Graduated compression stockings, sequential compression device, and aspirin 81 mg twice daily for 5 weeks for DVT Ppx. Weightbearing as tolerated, anterior precautions. PT to evaluate patient for any discharge disposition needs, CM/SW to assist with any discharge disposition needs. Patient will follow-up with me in clinic in 2 weeks for wound evaluation.

A 22 modifier has been added to this procedure secondary to the work performed was significantly greater than that usually performed for this procedure.

Due to the patient's BMI of 35 and significant musculature of the thigh, the patient required at least double the number of assistants for preoperative positioning, sterile preparation and drape of the injured extremity, and to hold retractors intraoperatively. The subcutaneous fat and significant musculature of the thigh required significant effort to retract, in addition to prolonged dissection with increased blood loss secondary to vascularity of the subcutaneous fat. The additional time incurred for this procedure was estimated to be 1.5 hours

Copies of preoperative and postoperative radiographs are available upon request and I would be happy to speak with designated representative regarding this modifier if necessary to further explain the difficultly of the procedure undertaken far outside the normal spectrum for the listed CPT codes.

**Compliations:** None

**Specimens:** None

**Estimated Blood Loss:** 300-400

**VTE Prophylaxis:** As ordered postop

**Disposition:** PACU

MD interpretation of fluoroscopy directly necessary intraoperatively in order to assess alignment and fixation stability. This was a dynamic process involving interpretation of the fracture pattern, reduction of the fracture, and safe implant placement. Additionally, final fluoroscopic evaluation was used to determine restoration of length, alignment, and rotation. These factors were directly assessed based on my evaluation of the fluoroscopic images.

**Disposition:** Postoperatively: The patient will be on 24 hours of overnight antibiotics. Multimodal pain control regimen has been initiated. Patient will mobilize with physical therapy as quickly as possible with plan for discharge on postoperative day 1. Graduated compression stockings, sequential compression device, and aspirin 81 mg twice daily for 5 weeks for DVT Ppx. Weightbearing as tolerated, anterior precautions. PT to evaluate patient for any discharge disposition needs, CM/SW to assist with any discharge disposition needs. Patient will follow-up with me in clinic in 2 weeks for wound evaluation.

Electronically signed by Robert M Hulick, MD at 9/18/2024 11:21 AM

Admission (Discharged) on 9/18/2024   *Note shared with patient*

## Care Timeline

| | |
|---|---|
| 09/18 0534 | Admitted (Observation) 0534 |
| 09/18 0708 | LEFT HIP ARTHROPLASTY (TOTAL) ANTERIOR |
| 09/20 1420 | Discharged 1420 |

# Mitchell, Willie J

MRN: E529009



**Robert M Hulick, MD**
Physician
Orthopedics

Op Note
Addendum

Date of Service: 3/5/2025 11:05 AM


Gulf Orthopaedics

**Operative Note**

**Date of surgery: 03/05/25**

**Pre-procedure Diagnosis:**   Right knee osteoarthritis

**Post-procedure Diagnosis:** same as pre-op diagnosis

**Procedure Performed:**
Right Total Knee arthroplasty

**Anesthesia:** Spinal

**Surgeon: R. Miles Hulick**
   **Assistant(s):  M. Wesley Carter CNRP**  was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He also helped ensure an excellent closure of the wound.

**Operative Narrative:**
After obtaining informed consent for the surgery, the risks and benefits of the surgery were explained in detail to the patient and family.  The risks include infection, nerve damage, excessive bleeding, the need for transfusion and the risks associated with transfusion, blood vessel damage, loss of limb and amputation, failure of the prosthesis, failure of implant and need for revision total knee arthroplasty, persistent pain, reflex sympathetic dystrophy and/or regional complex pain syndrome, leg length discrepancy, fracture, stiffness and loss of motion, instability, soft tissue impingement and persistent pain, peripheral nerve damage in both upper and/or lower extremities secondary to positioning, Bovie burn, skin and/or wound breakdown due to positioning, DVT, PE, risks associated with anesthesia, coronary arrest, death, progressive and/or accelerated degeneration of the opposite compartment.  The patient and family stated they fully understand the risks and benefits of surgery and wish to proceed with surgery to include left total knee arthroplasty.

   The patient was identified in the Pre-Op Holding area. Chart review was performed, and the operative site was marked, with the patient's confirmation, with my initials. The patient was then brought to the operative suite, and placed in the supine position. Anesthesia was administered. All bony prominences were padded. The operative leg was then prepped using an alcohol/iodine prep solution, and then draped in the usual sterile fashion with drapes, and an occlusive wrap over the incision site. The foot was

then positioned with the help of a sand bag. 1g of transexamic acid was administered.

Time out procedure was then called, with concurrence of the anesthetist, circulating nurse, and myself as to the surgical site, surgery to be performed, and pre-operative antibiotics given. The tourniquet was then applied.

A straight anterior midline incision was made from just below the tibial tubercle to an inch or so above the superior pole of the patella. Appropriate skin flaps were developed. A para-patellar arthrotomy was performed, and extended along the medial border of the patellar tendon. Any vessel lumens, or bleeding points were treated with the bovie device.

Intra-articular findings include : severe degenerative changes, eburnated bone medially, genu varus, and flexion contracture.

With the knee in extension the patella was mobilized by fat pad excision, and removal of synovium from the periphery of the patella, exposing the quad and patellar tendon insertions. The patella was then subluxed laterally as the knee was brought into flexion. Due to the significant tightness of the knee with limited soft tissue excursion, I first cut the patella to free up more space and placed the metal protection button.

The deep fibers of the medial collateral ligament were released from the medial aspect of the tibia, and underlying osteophytes were removed with a rongeur. Due to the significant varus deformity of the knee, the medial peel was taken further posteriorly to the midline of the tibia to release more of the superficial MCL. The anterior and posterior cruciate ligaments were excised. The medial and lateral menisci were removed with a bovie with care taken to not damage the collateral ligaments, and popliteal tendon. The bovie was used to cauterize the bed of the lateral meniscus to catch the artery entrance there.

OrthAlign was used to resect the proximal tibia preferentially in 1 to 2 degrees of varus to open the medial compartment. Additionally a medial reduction osteotomy was performed excising excess medial tibia in an effort to create more space in the medial compartment.

Similarly, OrthAlign navigation guides and the Depuy guides were used to resect the distal femur for a size 7 cruciate retaining femoral component. Posterior osteophytes were removed with a curved osteotome, and the posterior joint space was searched for loose bodies.

Then, I punched the proximal tibia appropriately for a size 7 tibial component, Depuy fixed bearing design. Spurs were then removed to the level of the trials, on both the femoral and tibial sides with a rongeur. Due to the severity of the deformity as well as the patient's overall size I elected to place a short stem on the tibial component. The tibial component was reamed to allow for 50 mm stem. Eburnated bone was "aerated" with a drill point to aid with cementation.

With the trial femoral and tibial components in place, trials of inserts were performed, demonstrating the 5 mm insert to be the correct size. During the trials fine points of ligamentous balancing were performed with additional releases as needed, and excision of redundant synovium. The lateral retinaculum was also inspected, with release of the synovium which bound the retinaculum to the lateral femoral condyle and to the popliteus.

The patella was then osteotomized parallel to its anterior surface with an oscillating saw, leaving a 13 mm thick wafer of bone. It was then sized, and drilled appropriately for a 35 mm patellar component. A patella trial was applied to the cut surface of the patella.

At the completion of the trials, range of motion, stability and alignment were all excellent.

Once all the balancing procedures were complete, the trial components were removed. 40mL of local anesthetic was placed in the posterior capsule and surrounding tissues. Aspiration was performed prior to injection posteriorly to ensure that blood vessels were avoided. All cut bony surfaces were cleansed with a jet driven irrigation device, using irrigation fluid. The femoral, tibial and patellar surfaces were then sequentially cleaned and dried. The femoral component was placed without cement and tibial components were placed with cement.

The knee was then placed into extension, and the patellar component was cemented in, using the patellar clamp to apply continuous pressure. Excess cement was removed with a Freer elevator and curettes. The cement was allowed to harden. The insert trial was removed, and replaced with the real insert, which was locked into place. Range of motion, and stability checking were once again performed, and were excellent.

Thorough irrigation of the surgical site was performed with normal saline solution. A final look for bleeding points was repeated. The retinaculum was then closed, starting with a figure of 8 stitch of #1 vicryl, placed just proximal to the patella. The retinaculum was then closed with #2 Quill suture, in a running fashion with over-sewing. The soft tissues were then closed with 2-0 monocryl and 3-0 stratafix in running subcuticular fashion. A silver bearing dressing was applied, with an Ace Wrap/TED hose applied from the toes to the upper thigh. The tourniquet was deflated during the procedure. The patient was then awakened from anesthesia, and transferred to the stretcher.

IMPLANTS:
Depuy Attune Femur size 7 cementless
DePuy attune tibia size 7 fixed-bearing, 50 mm stem
DePuy attune patella size 35
DePuy attune tibial insert size 7 x 5 mm

A 22 modifier will be applied to this case secondary to the significant increase in complexity due to the patient's pre-existing significant varus deformity necessitating alteration in bony cuts including preferential varus tibia resection as well as a medial tibial reduction osteotomy and additional medial peel to free up the MCL and allow for a stable extension gap. Additionally, the patient's overall size and limited soft tissue excursion significantly increased the complexity and time required for this case. Overall additional time required for this case over 1 hour

**Complications:** None

**Specimens:** None

**Estimated Blood Loss:** less than 50 ml

**VTE Prophylaxis:** As ordered post-op

**Disposition:** Postoperatively, patient will be taken to the postoperative care area. Will plan for admission to 23-hour observation. Patient will work with physical therapy today at least once, possibly twice pending timing and staff availability. Patient will work with physical therapy again tomorrow at least once prior to discharge. Aspirin 81 mg twice daily for DVT prophylaxis. Follow-up with me in 2 weeks in Mobile

Electronically signed by *No name on file* 3/5/2025 11:05 AM


Electronically signed by Robert M Hulick, MD at 3/5/2025 4:12 PM


Admission (Discharged) on 3/5/2025     *Note shared with patient*

## Care Timeline

03/05  Admitted (Observation) 0545
0545
03/05  RIGHT TOTAL KNEE REPLACEMENT
0703
03/05  Discharged 1420
1420

# Responsible Party Ledger

**Saraland Smiles**
1097 Industrial Parkway, Ste. E
Saraland, AL 36571
Ph : 251-675-3070

| | |
|---|---|
| Date : | 4/15/2025 |
| Account # : | 90057171 |
| Account Balance : | 2,312.00 |
| Billing Type : | Collection |
| Office # : | SRL305 |

WILLIE  MITCHELL
2104 WOLF RIDGE RD
APT 18
WHISTLER, AL 36612

Tuesday, April 15, 2025

| Date | Chart# | Patient Name | Th | Surf | Prdr | Code | Description | Charges | Credits | Curr. Bal. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Previous Balance** | 20.00 | | |
| 6/15/2023 | | Mitchell, Willie | | | 1351 | PP010 | PMT PAT-Direct Deposit... | | -20.00 | 0.00 |
| | | Mitchell, Willie | 18 | | 0950 | D6740 | Retainer Crown - Porce... | 781.00 | | 781.00 |
| | | Mitchell, Willie | 19 | | 0950 | D6245 | Pontic Porcelain/Ceram... | 778.00 | | 1,559.00 |
| | | Mitchell, Willie | 20 | | 0950 | D6740 | Retainer Crown - Porce... | 781.00 | | 2,340.00 |
| | | Mitchell, Willie | | | 1351 | D1110 | Prophylaxis - Adult | 64.00 | | 2,404.00 |
| | | Mitchell, Willie | | | 1351 | D1206 | Topical Application Of... | 29.00 | | 2,433.00 |
| 6/16/2023 | | Mitchell, Willie | | | MDP-AL | CLM-P | Pri Claim - Sent (2433.00) Closed: 06/27/2023 | | 0.00 | 2,433.00 |
| 6/24/2023 | | Mitchell, Willie | | | *** | PINS8 | PMT INS - ERA 835 (Dos:06/15/23) | | -29.00 | 2,404.00 |
| 7/7/2023 | | Mitchell, Willie | | | 0950 | PP010 | PMT PAT-Direct Deposit... | | -92.00 | 2,312.00 |
| | | Mitchell, Willie | 18 | | 0950 | ZD0101 | Deliver Bridge | 0.00 | | 2,312.00 |
| | | | | | | | **Total :** | **2,433.00** | **-141.00** | |

**Account Balance  as of  7/7/2023        : 2,312.00**

**Summary :**

| | |
|---|---|
| Total Charges : | 2,433.00 |
| Total Payments : | -141.00 |
| Total Adjustments : | 0.00 |

**Family Member Balances as of:  7/7/2023**

Willie  Mitchell :        2,312.00

**YTD Charges :** 2,765.00        **YTD Pat Payments :**  112.00        **YTD Ins Payments :**  341.00





# CRENSHAW

## PRODUCTION

### The Whistle Blower

By: Willie J. Mitchell AKA Pablo Crenshaw

Motion Picture Copyright /Registration #
TX 9-367-952

williemitchell1516@yahoo.com